**EXHIBIT A**

Nicholas Fortuna (NF-9191)
Megan J. Muoio (JM-6121)
Allyn & Fortuna
200 Madison Avenue, 5th Floor
New York, New York  10016
(212) 213-8844

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**CHRISTOPHER WATSON**           \*
300 Bucksley Lane
No. 305                          \*
Daniel Island, South Carolina 29492
                                 \*
and
                                 \*
**INTELLECTUS, LLC**             \*     Case No. 11 Civ. 0874
300 Bucksley Lane
No. 305                          \*
Daniel Island, South Carolina 29492
                                 \*
            Plaintiffs           \*

V.                               \*

**RIPTIDE WORLDWIDE, INC.**      \*
**(F/K/A SHEA DEVELOPMENT**
**CORP.)**                       \*
200 East Palm Valley Drive, 2nd Floor
Oviedo, Florida  32765          \*

and                              \*

**FRANCIS E. WILDE**             \*
316 Ridgehaven Place
Richardson, Texas  75080        \*

and                              \*

**TOMMY E. WHEELER**             \*
13846 Atlantic Blvd.
Unit #404                        \*
Jacksonville, Florida 32225
                                 \*

and
                                                            *

**E. JOSEPH VITETTA, JR.**                                  *
12301 Cicero Drive
Alpharetta, Georgia 30022                                   *

                                                            *
and
                                                            *

**RICHARD CONNELLY**                                        *
980 Foxdale
Fairview, Texas 75069-8760                                  *

                                                            *
and
                                                            *

**PHILIP E. LOEFFEL**                                       *
200 E. Palm Valley Drive
Suite 2000                                                  *
Oviedo, Florida 32765                                       *

            Defendants                                      *

*      *      *      *      *      *      *      *      *      *      *      *      *

## COMPLAINT

Christopher Watson ("Watson") and Intellectus, LLC ("Intellectus"), plaintiffs, by and through undersigned counsel, hereby bring the following Complaint for monetary damages against Riptide Worldwide, Inc. (f/k/a Shea Development Corp.) ("Riptide"), Francis E. Wilde ("Wilde"), Tommy E. Wheeler ("Wheeler"), Joseph Vitetta ("Vitetta"), Richard Connelly ("Connelly") (collectively the "Individual Defendants"), and Philip E. Loeffel ("Loeffel") and, in support of the Complaint, allege as follows:

## I.      PARTIES

1.      Watson is a resident of the State of South Carolina and formerly owned all of the stock of a software company called Bravera, Inc. ("Bravera").

2.      Intellectus is a limited liability company organized under the laws of the State of Florida with its principal place of business in South Carolina.  Watson owns 94% of the member

2

interests in Intellectus, is its Managing Member, and is authorized to act on its behalf in this matter.

3.      Riptide is a corporation organized under the laws of the State of Nevada with its principal place of business in Florida.

4.      Wilde is a resident of Texas and was the Executive Chairman of the Board of Directors and the Chief Executive Officer of Riptide at all times relevant to this action.

5.      Wheeler is a resident of Florida.  He was the President and Vice President of Mergers and Acquisition of Riptide and, later, Chairman of the Board of Directors of Riptide.

6.      Vitetta is a resident of Georgia and was the Senior, and later Executive, Vice President and Corporate Secretary of Riptide at all times relevant to this action.

7.      Connelly is a resident of Texas and was the Chief Financial Officer of Riptide at all times relevant to this action.

8.      Loeffel is a resident of the State of Florida.  He formerly served as the President and Chief Executive Officer of Riptide Software, Inc. prior to its acquisition by Riptide.  In July, 2009, he became Riptide's Chief Development Officer and has also served as the President of Riptide Worldwide.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because the claims asserted herein arise, in part, under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(j)(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.     This Court has personal jurisdiction over the Defendants because they expressly consented to jurisdiction in the state or federal courts of the State of New York.

11.     Venue is proper in the Southern District of New York because the Defendants expressly consented to venue in any federal or state court sitting in the State of New York, Borough of Manhattan.  Venue is also proper pursuant to 28 U.S.C. § 1391(a)(3) because this court has personal jurisdiction over the Defendants, and there is no other district in which this action should or must be brought.

## III.     FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Introduction

12.     Watson, a software engineer by training, formed Bravera to market computer software and services to provide workflow solutions for both governmental and private customers.  For example, Bravera supplied software and services that enabled the Federal Emergency Management Agency to track claims following a natural disaster.

13.     In March of 2007, Riptide, through Wilde and the other Individual Defendants, expressed an interest in the potential acquisition of Bravera.

14.     Riptide, Bravera, and Watson entered into a letter of intent in early April of 2007, and, on April 26, 2007, the parties signed an "Agreement and Plan of Merger" (hereinafter the "Merger Agreement") which set forth the terms of the transaction.

### B.     The Merger Agreement

15.     Although the Merger Agreement was dated April 26, 2007, the parties contemplated that the transaction would close several months later.  In fact, the transaction closed on July 16, 2007.

16.     The Merger Agreement was by and among Riptide, Watson, Bravera and "Shea Development Acquisition No. 3 Corp." – an entity Riptide established for the purpose of acquiring and effectuating the merger with Bravera.  *See* Merger Agreement, a copy of which has been attached hereto as Exhibit 1.

17.     The transaction involved a merger of Bravera into "Shea Development Acquisition No. 3 Corp." and the conversion of Watson's shares of Bravera stock into shares of Riptide common stock.  *Id.*

18.     Specifically, upon the closing of the merger, each of Watson's shares of Bravera stock was to convert into a pro rata share of 3,000,000 shares of Riptide stock that Riptide was issuing as merger consideration, as well as $1,500,000, which was the cash consideration for the merger.  *See* Ex. 1, Merger Agreement, at § 1.6.

19.     In addition, the Merger Agreement provides for potential "earn-out" payments to Watson if Bravera met certain annual performance targets following the merger of Bravera into Riptide.  Specifically, the Merger Agreement provided that, at the one and two year anniversaries of the closing, Watson would be entitled to cash and warrants to receive additional Riptide stock if Bravera satisfied certain performance targets based on Bravera's revenues and "EBITDA" (earnings before income, taxes, depreciation and amortization).  *Id.*, at § 1.13.

C.     **The Defendants' Misrepresentations Concerning Capitalization**

20.     Because Watson was to receive Riptide common stock and was agreeing to accept future shares and/or warrants as part of the consideration for the sale of Bravera, it was of critical importance that Watson be able to assess the true value of that stock and that Riptide not take actions that might dilute the value of his holdings or increase the risk of his investment in Riptide.

21.     During the negotiations, Wilde and the other Individual Defendants made specific representations regarding Riptide's capital structure.   Specifically, Wilde and the other Individual Defendants represented that Riptide had issued only 24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock, respectively.   This representation was subsequently included in the Merger Agreement, which provided:

> 24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock, respectively, are issued and outstanding as set forth in the Capitalization Table attached hereto and incorporated herein as Schedule 3.2. Other than as set forth on Schedule 3.2, there are no shares of Parent Company Stock or Series A Preferred Stock outstanding.

*See* Ex. 1, Merger Agreement, at § 3.2.

22.     Wilde and the other Individual Defendants also told Watson during the negotiations that there were "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock."   This specific representation also was incorporated into the Merger Agreement.  *Id.*

23.     Despite the fact that the Merger Agreement itself made reference to a "Capitalization Table" and a "Schedule 3.2," no such documents were provided to Watson or included in the final, executed Merger Agreement.  Indeed, although Watson repeatedly asked the Individual Defendants whether Riptide had prepared a Capitalization Table or Schedule 3.2 that modified Section 3.2, Riptide and the Individual Defendants never provided any such Capitalization Table or Schedule.

24.     The representations that the Individual Defendants made concerning the number of outstanding shares and the non-existence of any options or other commitments, which were

6

subsequently incorporated in section 3.2 of the Merger Agreement, were false. Wilde and the other Individual Defendants knew, or should have known, that Riptide had more shares outstanding and had committed itself to issue more shares than were disclosed to Watson in Section 3.2.

25.     For example, on July 13, 2007, immediately prior to the closing of the merger, Riptide entered into a "Securities Purchase Agreement" with two investors pursuant to which Riptide obligated itself to issue an additional 12,797,500 shares of Riptide Common Stock, par value $0.001 per share, and warrants to purchase 3,500,000 shares of Riptide Common Stock.

26.     Despite the materiality of the Securities Purchase Agreement, neither Riptide nor any of the Individual Defendants – all of whom had knowledge of the transaction – informed Watson of the existence or terms of the Securities Purchase Agreement.

27.     On July 12, 2007, five days before the closing under the Merger Agreement, Riptide amended its Articles of Incorporation to increase the authorized number of shares of preferred stock from 20,000,000 – the amount Riptide represented in Section 3.2 of the Merger Agreement – to 60,000,000.

28.     One day later, on July 13, 2007, Riptide issued an additional 1,000,000 shares of Series A convertible preferred stock. Riptide also altered the price of its Series A stock.

29.     Again, despite the obvious materiality of these actions, neither Riptide nor any of the Individual Defendants informed Watson that Riptide had: (i) issued additional shares of Series A stock; (ii) altered the rights of Series A shareholders; or (iii) amended its Articles of Incorporation to permit a threefold increase in the number of preferred shares it was authorized to issue.

30.     On July 13, 2007, Riptide entered into a "Series B Preferred Stock Purchase Agreement" with certain investors under which Riptide issued a new series of stock-convertible Series B preferred stock.  These Series B shares – 4,600,000 were issued – could be converted at any time into an aggregate of 9,200,000 shares of common stock.

31.     On information and belief, the Series B shares had preferred rights, including the right to receive dividends, the right of redemption and the right to convert to common stock at the shareholder's request.

32.     Again, neither Riptide nor the Individual Defendants informed Watson of the Series B Preferred Stock Purchase Agreement or its terms prior to the closing of the transaction.

**D.      The Defendants' Misrepresentations Concerning Riptide's Financing And Debt**

33.     It was also of key importance to Watson that Riptide have the financial wherewithal to effectuate the merger, and that it not have debts or liabilities that would jeopardize the value of Riptide stock that Watson agreed to accept as partial consideration for the transaction.

34.     During the negotiations with Watson, Wilde and the Individual Defendants represented that Riptide did not have any extraordinary debts, liabilities, or obligations that would be required to be reflected on Riptide's balance sheet.   This representation was subsequently incorporated into the Merger Agreement:

> Except as and to the extent set forth or reserved against on the consolidated balance sheet of Parent, none of Parent or any Subsidiary of Parent has any Liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet or in notes thereto, except for Liabilities or obligations incurred in the ordinary course of business consistent with past practice since January 1, 2007.

*See* Ex. 1, Merger Agreement, at § 3.4(b).

35.     With the knowledge and assistance of the Individual Defendants, Riptide also represented and warranted to Watson that its financial statements were "correct and complete in all material respects and each presented fairly, in all material respects" Riptide's financial position and results of operations. *Id.*, at § 3.4(a).

36.     These representations were false.   In fact, Riptide had assumed substantial liabilities that were not disclosed to Watson by Riptide or any of the Individual Defendants – all of whom had knowledge of the new liabilities.

37.     As noted above, Riptide entered into significant commitments on July 13, 2007 in connection with the Securities Purchase Agreement (under which it was obligated to issue additional common stock) and the Series B Preferred Stock Purchase Agreement (under which it issued the Series B preferred stock).

38.     Moreover, the Securities Purchase Agreement required Riptide to issue debt – senior secured notes – in an aggregate principal amount of $7,222,222.22.   Riptide would be required, beginning January 1, 2008, to pay to the note holders 1/30th of this principal amount (approximately $241,000 per month) plus unpaid accrued interest.   This arrangement proved so onerous to Riptide that it was unable to make any of the required payments.

39.     The various agreements that Riptide entered into concerning the senior notes and the issuance of additional shares caused it to incur substantial costs and fees.

40.     For example, as of July 13, 2007, Riptide estimated that it had incurred some $1,280,000 in expenses in connection with the Securities Purchase Agreement from investment bankers, attorneys, and other professionals, which it knew it would have to pay in cash and/or warrants.   Indeed, following the closing of the merger, Watson requested additional information

from Riptide concerning Riptide's expenses and use of funds, but Riptide refused to provide that information to Watson.

41.     Although these agreements and expenses constituted liabilities and significantly altered Riptide's financial picture, Riptide, Wilde, and the other Individual Defendants failed to disclose this critical information to Watson, who relied upon a version of Riptide's financial statements that did not reflect these significant commitments.

42.     Also during negotiations, Wilde and the other Individual Defendants represented that the pending merger would not result in a "lien" on Riptide or any of its subsidiaries.  This representation was subsequently incorporated into the Merger Agreement, with the Merger Agreement defining "lien" as "any mortgage, pledge, assessment, security interest, lease, lien, easement, charge or adverse claim or other encumbrance of any kind." *Id.*, at §§ 3.5(c)(vi) and 10.1.

43.     Riptide, Wilde, and the other Individuals Defendants knew, or should have known, that this representation was false when it was made.

44.     Pursuant to the Securities Purchase Agreement, which was executed to facilitate the consummation of the merger, the senior notes that Riptide issued were secured by a first lien on all of the assets of Riptide.

45.     Neither Riptide nor any of the Individual Defendants informed Watson that Riptide had given a lien on all of its assets in connection with the Securities Purchase Agreement prior to the July 16, 2007 closing of the merger.

46.     Further, the debt incurred and liens given by Riptide caused Riptide to breach a condition precedent to the closing of the merger – that, prior to the Closing, there would be no "Material Adverse Change in the Business or Condition of the Company." *Id.*, at § 6.3(f).

"Material Adverse Change" was defined by the Agreement as "any change in the financial condition and operation" of Riptide that resulted in a "deterioration of the balance sheet of [Riptide] by an amount equal or greater than $500,000." *Id.*, at Art. 10, p. 46.

47.     Riptide further represented and warranted, in Section 3.7 of the Merger Agreement, that:

> There is no agreement, judgment, injunction, Order or decree binding upon the Parent or Merger Sub, or any of their Assets and Properties which has had or could reasonably be expected to have the effect of prohibiting or impairing any current or future business practice of the Parent or Merger Sub, respectively, any acquisition of property by the Parent or Merger Sub or the conduct of business by the Parent or Merger Sub as currently conducted or as proposed to be conducted by the Parent or Merger Sub, directly related to this Agreement.

*Id.*, at § 3.7.

48.     Riptide, Wilde, and the other Individual Defendants knew, or should have known, that this representation was false because the Security Purchase Agreement and other actions Riptide had taken would inevitably and severely impair Riptide's business.

49.     In fact, Wilde and the other Individual Defendants told Watson during the negotiations that Riptide's financial records, minute books, and share records were complete and up-to-date. This representation also was incorporated in the Merger Agreement which provided, in relevant part, that "[t]he minute books, including the share registers, and other similar records of [Riptide] . . . are complete and correct in all material respects and have been maintained in accordance with sound business practices." *Id.*, at § 3.6.

50.     Riptide, Wilde, and the other Individual Defendants knew, or should have known, that this representation was false when it was made.

51.     As noted above, Riptide entered into a series of agreements to incur debt and significantly alter its capital structure.  The minute books and records made available to Watson either did not reflect these transactions or inaccurately depicted Riptide's actions.

52.     Perhaps most importantly, Wilde and the other Individual Defendants expressly told Watson that he would be paid the cash portion of his consideration at closing.  Again, this representation was included in the Merger Agreement. *Id.*, at § 1.6(ii)

53.     In addition, the Merger Agreement expressly provided that Riptide had or would obtain the necessary funds to complete the merger. *Id.*, at § 3.18

54.     Riptide, Wilde, and the other Individual Defendants knew, or should have known, that this representation was false when made, as they all knew, or should have known, that Riptide lacked the finances to complete the merger without incurring significant debt and other financial obligations.

55.     The various representations and warranties of Riptide, Wilde, and the other Individual Defendants in the negotiations leading up to, and subsequently incorporated into, the Merger Agreement were to be accurate as of the Closing Date *(i.e.,* July 16, 2007). *Id.*, at § 5.11 and 6.2(a).   Riptide and the Individual Defendants never supplemented or corrected their representations and warranties, as required by the Merger Agreement. *Id.*, at § 5.11.

**E.**     **The Closing**

56.     The merger closed on or about July 16, 2007.

57.     The cash consideration for the merger was to be $1,500,000.  At or around the closing, however, Riptide purported to pay Watson $800,000 in cash when, in fact, of that amount, $525,000 was utilized to retire Bravera debt and was not paid to Watson.  Thus, of the

$1,500,000 it was committed to pay, Riptide actually paid Watson only $275,000 in cash at closing.

58.     In its securities filings, Riptide disclosed that $700,000 was "payable" to Watson "at a second closing."

59.     In fact, this second closing never occurred, and, to date, Riptide has not paid Watson any additional amount toward the cash consideration for the merger.

60.     Likewise, Riptide purported to issue to Watson 3,000,000 shares of Riptide Common Stock and an additional 5,000,000 shares of Riptide Common Stock that was supposed to vest ratably over thirty-six months beginning on July 1, 2007.  Based on the improper dilution of the Riptide Common Stock described above and prohibitions on Watson's ability to sell or otherwise transfer those shares, however, the Riptide Common Stock conveyed to Watson was worthless.

61.     Riptide also gave Watson warrants to acquire up to 2,937,500 shares of Riptide Common Stock at an exercise price of $1.00 per share with a five year term, exercisable over time.  Like the shares of Riptide Common Stock, however, the warrants given to Watson were worthless.

62.     In addition, just days prior to the closing, Riptide, Wilde and the other Individual Defendants induced Watson to pay $125,000 in current "accounts payable" on behalf of Bravera (despite the fact that Bravera's current "accounts receivable" exceeded the "accounts payable") with the promise that this amount would be re-paid at, or soon after, closing.  Despite their promise, Riptide and the Individual Defendants never repaid Watson this short-term loan.

63.     Riptide has wrongfully denied that it has any obligation to pay Watson the remainder of what it owes him under the Merger Agreement or the short-term loan.

64.     Riptide has wrongfully and unilaterally "canceled" future payments due to Watson, stating publicly that it did not have an obligation to make any further payments to Watson.

**F.**      **The Employment Agreement**

65.     As part of Riptide's acquisition of Bravera, the parties entered into a Senior Management Employment Agreement ("Employment Agreement") among Bravera, Riptide, and Watson, which was dated July 15, 2007. *See* Employment Agreement, a copy of which has been attached hereto as Exhibit 2.

66.     During the negotiation of the Employment Agreement, Wilde and the other Individual Defendants represented to Watson that he was going to be employed by Bravera for a period of three (3) years but that he could terminate his employment at any time, as long as he provided thirty (30) days notice to Bravera.  These representations were incorporated in the Employment Agreement. *Id.*, at §§ 3 and 10(a).

67.     Moreover, Wilde and the other Individual Defendants represented to Watson that he would be paid all compensation due to him under the Merger Agreement and the Employment Agreement if his employment ended within the three year period for any reason other than for cause.   This representation also was incorporated in the Employment Agreement, which specifically provided that, if Watson's "employment with the Company terminates for any other reason" than "Cause," as defined in the contract, then:

> all earnout and other consideration due Employee under that certain Merger Agreement dated April 26, 2007 and due Employee's affiliates, Intellectus, LLC, under the certain Software License and Assets Purchase Agreement [sic] dated as of even date herewith shall be accelerated and paid on the Termination Date.

*Id.*, at § 6(b).

68.     During the negotiations, Watson was promised other compensation, as long as his employment was not terminated for cause.  These representations were also incorporated into the Employment Agreement, which expressly provided that, if Watson's employment terminated for any reason other than "Cause," he would be entitled to the following additional benefits:

    a.    "an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination" -- then $250,000;

    b.    "a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by the Company and achieved all goals and objectives . . . .";

    e.    "all benefits for a period of six (6) months after the Termination Date";

    d.    "the same medical coverage Employee carried while an active employee at Company's expense for a period of six (6) months after the Termination Date".

*Id.*, at § 6(b).

69.     Watson terminated his employment with the requisite thirty days' written notice on October 29, 2007.  Although his employment with Bravera was not terminated with "Cause," neither Bravera nor Riptide has made any portion of these required payments to Watson.

## G.     The Software License And Asset Purchase Agreement

70.     Intellectus was the developer and owner of the intellectual property rights to software known as "Bravera Process Director," "Bravera Content Director," and "Bravera RAPID Workplace" (collectively the "Software") and the trademarks Bravera™ and Rapid Workplace™ (the "Trademarks").

71.     Prior to its acquisition by Riptide, Bravera utilized the Software to provide workflow solutions to both governmental and private customers.  In collaboration with

Intellectus, Bravera also assisted in the design and development of enhancements to increase the utility and value of the Software.

72.   In connection with the acquisition of Watson's interest in Bravera under the Merger Agreement, Riptide also sought to acquire a license enabling it to have the exclusive rights to use, market, copy, sublicense, modify, and further develop the Software and use and license the Bravera™ and Rapid Workplace™ trademarks.

73.   In regard to the Software transaction, Wilde represented to Watson and Intellectus that an entity known as IP Holding of Nevada Corp. ("IP Holding Corp."), purportedly a subsidiary of Riptide, would enter into a Software License and Asset Purchase Agreement (the "Software License") with Intellectus. *See* Software License, a copy of which is attached here to as Exhibit 3.

74.   Pursuant to the Software License, Intellectus was to grant:  (i) a license with respect to Intellectus' intellectual property rights in the Software for the use, marketing, sublicensing, modification, and further development of the Software; and (ii) the right to purchase Intellectus' intellectual property rights in the Software and the Trademarks upon receipt by Intellectus of payments equal to or exceeding the sum of One Million Dollars ($1,000,000) from IP Holding Corp. *Id.*, at Art. II, § 1 and Exhibit B.

75.   In turn, IP Holding Corp. was to provide Intellectus with 450,000 warrants to purchase Riptide stock at $1.00 per share and pay Intellectus $750,000 on the first anniversary of the closing date and $350,000 on the second and the third anniversaries of the closing date. *Id.*, at Exhibit C, at § 1.1.

76.     In addition, Intellectus was entitled to "earn out" payments for the first three years totaling up to $2,225,000, depending on the combined EBITDA of Intellectus and Bravera for those years. *Id.*, at Exhibit C, at § 1.2

77.     In addition, the parties to the Software Agreement contemplated that IP Holding Corp., its subsidiaries or affiliates and/or Intellectus would continue to create "derivative works" of the Software during the term of the license.   As defined by the Software Agreement, "Derivative Works" included "any work, revision, elaboration, enhancement, modification, translation, condensation or other expansion that is based upon the Software or any portion thereof." *Id.*, at Art. I.

78.     The Software License also provided that, if IP Holding Corp. materially breached the agreement, the license would terminate and IP Holding Corp. would be required to transfer to Intellectus "all right, title and interest" held by IP Holding Corp. in any "Derivative Works." *Id.*, at Art. II, ¶ 5.

79.     Because, like Watson, Intellectus was receiving warrants for Riptide stock as part of the Software License, it was very important to Intellectus that: (i) IP Holding and its parent company, Riptide, have the financial wherewithal to consummate the Software License; (ii) IP Holding and Riptide not have debts or liabilities that would jeopardize the value of the Riptide stock that Intellectus agreed to accept as partial consideration for the transaction; and (iii) that Riptide not take actions that might dilute the value of its stock or increase the risk of loss to its shareholders.

80.     As detailed above, Riptide and the Individual Defendants misrepresented the ability of IP Holding and Riptide to consummate the deal, the amount of debt held by Riptide, and the relative value of Riptide's stock.   Those misrepresentations included the following:

a. the representation that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

b. the representation that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

c. the representation that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d. the representation that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e. the representation that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger; and

f. the representation that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Intellectus.

81. At the closing under the Merger Agreement on July 16, 2007, Watson executed the Software License on behalf of Intellectus, and Wilde purported to execute the Software License in his capacity as Chairman and CEO of IP Holding Corp.

82. In reliance upon representations made by IP Holding, Riptide, Wilde and the other Individual Defendants and in the belief, based upon those representations, that the Software

License was legally valid and binding, Watson directed Intellectus to deliver the Source Code and the Object Code for the Software as well as work in progress enhancements of the Software to Bravera.

83.     Subsequent to the merger in July, 2007, Riptide assumed ownership and control of Bravera.  During that time, Riptide substantially mismanaged Bravera's operations, which resulted in substantial failures of performance by Bravera under both governmental and private contracts in which Bravera was utilizing the Software as a part of the basis for its services.  The mismanagement of Bravera's operations and its performance under these contracts caused substantial damage to the marketability of the Software and to the value of the Trademarks.

84.     In addition, IP Holding and/or Bravera did, in fact, create Derivative Works during the course of the license, primarily under the direction of Watson.

85.     Despite the fact that Intellectus had satisfied its obligations under the Software License and IP Holding Corp., Bravera and Riptide had received and used the Software, Intellectus never received any payment either from the entity purportedly known as IP Holding Corp. or from its purported parent company, Riptide.

86.     Further, because Watson's employment was not terminated for cause, IP Holding and Riptide were obligated to pay Intellectus $3,750,000 and issue warrants to purchase 450,000 shares of Riptide common stock.

87.     Neither IP Holding Corp. nor Riptide has made those payments or issued those warrants.

88.     Finally, Riptide, at the direction of defendant Loeffel, delivered to Watson a number of servers that had been in Bravera's possession on which the Software had been loaded. Upon receipt of these servers, however, Watson determined that the Software and the Derivative

Works had been removed or destroyed from the servers. Thus, Riptide failed to transfer to Intellectus the "Derivative Works" that had been developed, as required by the Software License.

89.     Despite repeated demand by Watson, on behalf of Intellectus, neither Riptide, IP Holding of Corp., Wilde, or Loeffel have returned the Software or any of the "Derivative Works" to Intellectus.

## G.     The Supplemental Agreement

90.     As a result of Riptide's material breaches of the Merger Agreement, the Employment Agreement and the Software License, Watson and Intellectus filed a lawsuit against Riptide, Bravera, and IP Holding Corp. in the Supreme Court of the State of New York, Index No. 600114/08 (the "Watson Litigation").

91.     At or about the same time, Riptide, Bravera, and IP Holding Corp. filed a lawsuit against Watson and Elizabeth Anne Conley in this Court, Docket No. 07 Civ. 11201 (DLC) (GWG) (the "Riptide Litigation").

92.     During the pendency of the Watson Litigation and the Riptide Litigation, the parties, with assistance from the Court, engaged in settlement negotiations in an effort to resolve their respective claims.

93.     During those negotiations, Wilde, on Riptide's behalf, represented to Watson and Intellectus that Riptide had the wherewithal to make a substantial payment to resolve the dispute. Indeed, at a Settlement Conference before Magistrate Judge Gabriel W. Gorenstein of this Court on July 10, 2008, the Court specifically asked Defendant Wilde if he was "agreeing to [the settlement] on behalf of Shea, Riptide, and any other related entities," and defendant Wilde's response was: "Yes, Your Honor."

94.     Riptide, Wilde, and the other Individual Defendants knew, or should have known, however, that the representations to Watson, Intellectus and the Court regarding Riptide's ability to fund a monetary settlement were false.

95.     Relying upon the representations made to them, Watson and Intellectus entered into an agreement (the "Supplemental Agreement") with Riptide, Bravera, and IP Holding Corp. under which, among other things, Riptide agreed to pay Watson $175,000 in cash and deposit $275,000 in an escrow account, which monies were to be released to Watson upon his resolution of a potential tax liability of Bravera.

96.     In return, Watson was to return the worthless Riptide stock that had been given to him as part of the merger.

97.     Watson fully performed his obligations under the settlement reached by the parties in the Supplemental Agreement, including dismissing the Watson Litigation, without prejudice.

98.     Riptide, Bravera, and IP Holding of Nevada Corp., however, materially breached the Supplemental Agreement by failing to make the cash payment to Watson or to place funds in escrow as required under the Supplemental Agreement.

99.     Because of the material breach of the Supplemental Agreement by Riptide, Bravera, and IP Holding of Nevada Corp., Watson and Intellectus have rescinded the Supplemental Agreement.

## COUNT I
### (Breach of Merger Agreement:  Watson v. Riptide)

100.    Watson realleges and incorporates the allegations contained in Paragraphs 1 through 99 of this Complaint as if set forth in full in this Count I.

101.   Watson and Riptide entered into the written Merger Agreement, which is a valid, binding contract supported by adequate consideration.

102.   Watson performed his obligations under the Merger Agreement by, among other things, conveying the shares of Bravera to Riptide's subsidiary in accordance with the Merger Agreement and has otherwise satisfied any conditions to the filing of this action.

103.   Riptide failed to perform and, thus, materially breached its obligations to Watson under the Merger Agreement.

104.   Among other things, Riptide failed to pay Watson all of the cash consideration required under the Merger Agreement, a portion of which it acknowledged in its own securities filings.

105.   Riptide also breached various representations and warranties in the Merger Agreement and failed to convey to Watson other consideration it required under that Agreement, including stock in Riptide and warrants to purchase additional shares of Riptide common stock.

106.   As a direct and proximate result of Riptide's breaches of the Merger Agreement, Watson was injured and is entitled to damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Defendant Riptide Worldwide, Inc. in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest and the cost of this suit and such other and further relief as the Court deems proper.

## COUNT II
### (Breach of Employment Agreement:  Watson v. Riptide)

107.   Watson realleges and incorporates the allegations contained in Paragraphs 1 through 106 of this Complaint as if set forth in full in this Count II.

108.   Watson and Riptide entered into the written Employment Agreement, which is a valid, binding contract supported by adequate consideration.

109.    Watson performed his obligations under the Employment Agreement by, among other things, working for Riptide and Bravera as the head of their sales groups and has otherwise satisfied any conditions to the filing of this action.

110.    Riptide failed to perform its obligations under the Employment Agreement to pay monies and provide benefits owed to Watson under that Agreement.

111.    Among other things, Riptide breached its obligations by failing to pay to Watson, upon the termination of this employment:

    a.    "all earnout and other consideration" under the Merger Agreement that accelerated upon the termination of Watson's employment;

    b.    "an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination" or $250,000;

    c.    "a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by the Company and achieved all goals and objectives . . . ."; and

    d.    "all benefits for a period of six (6) months after the Termination Date."

112.    Although Watson terminated his employment only after giving the requisite thirty days' written notice on October 29, 2007, and although Bravera did not terminate his employment for "Cause," neither Bravera nor Riptide has made any portion of these required payments to Watson.

113.    As a direct and proximate result of Riptide and Bravera's breaches of the Employment Agreement, Watson has been injured and is entitled to damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Defendant Riptide Worldwide, Inc. in excess of in excess of Ten Million Dollars ($10,000,000) as compensatory damages

together with interest and the cost of this suit and such other and further relief as the Court deems proper.

## COUNT III
### (Negligent Misrepresentation:  Watson v. Riptide and Individual Defendants)

114.    Watson realleges and incorporates the allegations contained in Paragraphs 1 through 113 of this Complaint as if set forth in full in this Count III.

115.    Riptide and each of the Individuals Defendants owed Watson a duty of truthfulness and honesty in the negotiations that resulted in the Merger Agreement and the Employment Agreement.  This duty arose by virtue of Riptide's and the Individual Defendants' superior knowledge of Riptide's financial status, the lengthy negotiation between the parties, the intended long-term relationship between the parties, and the close and trusting relationship between the parties that arose during the negotiations.

116.    Material information provided to Watson during the negotiation of the Merger Agreement was incorrect.  That information included, but is not limited to, the following:

      a.      the representation, reflected in Section 3.2 of the Merger Agreement, that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

      b.      the representation, reflected in 3.2 of the Merger Agreement, that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

      c.      the representation, reflected in 3.2 of the Merger Agreement, that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into

24

agreements committing it to issue additional shares of stock and warrants to buy stock;

d.      the representation, reflected in Section 3.4(b) of the Merger Agreement, that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e.      the representation, reflected in Section 3.4(a) of the Merger Agreement, that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f.      the representation, reflected in Section 3.5(c) of the Merger Agreement that the merger would not result in any liens against Riptide's assets when, in fact, Riptide had previously incurred substantial debt to pay for the merger that involved a lien against all of Riptide's assets;

g.      the representation, reflected in Section 3.7 of the Merger Agreement, that the merger would not impair the business of Riptide, when, in fact, Riptide had incurred massive and crippling debt to pay for the merger (which it had not disclosed to Watson);

h.      the representation, reflected in Section 3.6 of the Merger Agreement, that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Watson; and

i.      the representation, reflected in Section 3.18 of the Merger Agreement, that Riptide had "or shall obtain funds sufficient to pay at Closing" the cash portion of Watson's consideration, when, in fact, Riptide did not have such funds and that the debt it incurred to permit the merger rendered it unable to meet its obligations;

j.      the representations relating to the Employment Agreement that Watson would be paid all "earn-out" and other consideration under the Merger Agreement as well as a minimum of $250,000 in salary, when, in fact, no such payments were ever going to be made;

k.     the representation made in Riptide's SEC filings regarding a second closing at which Watson would be paid $700,000, when, in fact, no such closing was ever going to occur;

l.     the representations and promises of payment made by Riptide and the Individual Defendants to induce Watson into entering the Supplement Agreement, when, in fact, no such payments were ever going to be made.

117.     Each of these express representations was false, and Riptide and the Individual Defendants knew or should have known that they were false when made.

118.     In addition, because of the duties then owed to Watson, Riptide and each of the Individual Defendants had an affirmative duty to correct any misinformation that was provided. However, Riptide and all of the Individual Defendants failed to correct the misinformation provided to Watson despite the fact that they all knew, or should have known, of the falsity of the information.

119.     Watson was unaware of the true facts and relied on the false and misleading statements made by Riptide and the Individual Defendants in entering into the Merger Agreement, the Employment Agreement, and the Supplemental Agreement and in carrying out his performance and accepting the consideration and terms set forth in those Agreements.

120.     As a direct and proximate result of the negligent misrepresentations made by Riptide and the Individual Defendants, Watson was injured and is entitled to damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Riptide Worldwide, Inc. and each of the Individual Defendants, jointly and severally, in excess of in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit and such other and further relief as the Court deems proper.

<u>COUNT IV</u>
**(Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, As Amended:  Watson v. Riptide and Wilde)**

121.    Watson realleges and incorporates the allegations contained in Paragraphs 1 through 120 of this Complaint as if set forth in full in this Count IV.

122.    Defendants Riptide and Wilde knowingly and intentionally misrepresented and concealed from Watson material facts concerning the financial condition and prospects of Riptide, both during the negotiation of the Merger Agreement and thereafter, including, without limitation, in public filings with the Securities and Exchange Commission.

123.    Those representations include, but are not limited to, the following:

a.      the representation, reflected in Section 3.2 of the Merger Agreement, that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

b.      the representation, reflected in 3.2 of the Merger Agreement, that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

c.      the representation, reflected in 3.2 of the Merger Agreement, that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d.      the representation, reflected in Section 3.4(b) of the Merger Agreement, that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

27

e.   the representation, reflected in Section 3.4(a) of the Merger Agreement, that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f.   the representation, reflected in Section 3.5(c) of the Merger Agreement that merger would not result in any liens against Riptide's assets when, in fact, Riptide had previously incurred substantial debt to pay for the merger that involved a lien against all of Riptide's assets;

g.   the representation, reflected in Section 3.7 of the Merger Agreement, that the merger would not impair the business of Riptide, when, in fact, Riptide had incurred massive and crippling debt to pay for the merger (which it had not disclosed to Watson);

h.   the representation, reflected in Section 3.6 of the Merger Agreement, that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the Company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Watson; and

i.   the representation, reflected in Section 3.18 of the Merger Agreement, that Riptide had "or shall obtain funds sufficient to pay at Closing" the cash portion of Watson's consideration, when, in fact, Riptide did not have such funds and that the debt it incurred to permit the merger rendered it unable to meet its obligations;

j.   the representation made in Riptide's SEC filings regarding a second closing at which Watson would be paid $700,000, when, in fact, no such closing was ever going to occur.

124.   The representations and omissions by the Defendants Riptide and Wilde set forth above were false and were known to be false when made and were made for the purpose of inducing Watson to rely on them.

125.   The representations set forth above were made in connection with the sale of securities by Watson to Riptide and by Riptide to Watson and, in making the representations,

Defendants Riptide and Wilde employed the means and instrumentalities of interstate commerce and communication.

126.   Watson reasonably relied on the representations and omissions of Defendants Riptide and Wilde in entering into the Merger Agreement.

127.   These false representations by Defendants Riptide and Wilde are in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which prohibits any person from "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

> (a)   To employ any device, scheme or artifice to defraud,
>
> (b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
>
> (c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

128.   As a result of Defendants Riptide and Wilde's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Watson is entitled to damages in an amount to be determined at trial.

129.   In addition, the conduct of Defendants Riptide and Wilde, as alleged herein, was wanton, willful, and malicious, and, therefore, Watson is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Defendants Riptide Worldwide, Inc. and Wilde in excess of in excess of Ten Million Dollars ($10,000,000) as compensatory damages and in the amount of Two Million Dollars ($2,000,000) as punitive or exemplary

damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

<u>**COUNT V**</u>
**(Violation of Section 20(a) of the Exchange Act of 1934,**
**As Amended:  Watson v. Wilde)**

130.    Watson realleges and incorporates the allegations contained in Paragraphs 1 through 129 of this Complaint as if set forth in full in this Count V.

131.    As set forth in detail above, Defendant Wilde knowingly and intentionally misrepresented and concealed from Watson material facts concerning the financial condition and prospects of Riptide, both in negotiations of the Merger Agreement and thereafter and in public filings with the Securities and Exchange Commission.

132.    By virtue of his high-level position, ownership and contractual rights, participation and awareness of Riptide operations, Defendant Wilde had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Riptide, including the content and dissemination of the various statements that Watson alleges were false and misleading.  Wilde acted as the controlling person of Defendant Riptide within the meaning of Section 20(a) of the Exchange Act.

133.    Defendant Wilde violated Section 20(a) of the Exchange Act through the misrepresentations and omissions detailed above.  By virtue of his position as controlling person, he is liable pursuant to Section 20(a) of the Exchange Act.

134.    As a result of Defendant Wilde's violation of Section 20(a) of the Exchange Act, Watson has been damaged in an amount to be determined at trial.

135.   In addition, the conduct of Defendant Wilde, as alleged herein, was wanton, willful, and malicious, and, therefore, Watson is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Defendant Wilde in excess Ten Million Dollars ($10,000,000) as compensatory damages and in the amount of Two Million Dollars ($2,000,000) as punitive or exemplary damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

## COUNT VI
**(Common Law Fraud:  Watson v. Riptide and Wilde)**

136.   Watson realleges and incorporates the allegations contained in Paragraphs 1 through 135 of this Complaint as if set forth in full in this Count VI.

137.   Defendants Riptide and Wilde knowingly and intentionally misrepresented and concealed from Watson material facts concerning the financial condition and prospects of Riptide at all relevant times, both in negotiation of the Merger Agreement and thereafter.

138.   Such misrepresentations included, but are not limited to, the following:

    a.    the representation, reflected in Section 3.2 of the Merger Agreement, that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

    b.    the representation, reflected in 3.2 of the Merger Agreement, that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

    c.    the representation, reflected in 3.2 of the Merger Agreement, that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any

31

authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d.      the representation, reflected in Section 3.4(b) of the Merger Agreement, that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e.      the representation, reflected in Section 3.4(a) of the Merger Agreement, that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f.      the representation, reflected in Section 3.5(c) of the Merger Agreement that merger would not result in any liens against Riptide's assets when, in fact, Riptide had previously incurred substantial debt to pay for the merger that involved a lien against all of Riptide's assets;

g.      the representation, reflected in Section 3.7 of the Merger Agreement, that the merger would not impair the business of Riptide, when, in fact, Riptide had incurred massive and crippling debt to pay for the merger (which it had not disclosed to Watson);

h.      the representation, reflected in Section 3.6 of the Merger Agreement, that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the Company's crippling financial condition and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Watson; and

i.      the representation, reflected in Section 3.18 of the Merger Agreement, that Riptide had "or shall obtain funds sufficient to pay at Closing" the cash portion of Watson's consideration, when, in fact, Riptide did not have such funds and that the debt it incurred to permit the merger rendered it unable to meet its obligations;

j.      the representations relating to the Employment Agreement that Watson would be paid all "earn-out" and other consideration under

the Merger Agreement as well as a minimum of $250,000 in salary, when, in fact, no such payments were ever going to be made;

k.      the representation made in Riptide's SEC filings regarding a second closing at which Watson would be paid $700,000, when, in fact, no such closing was ever going to occur;

l.      the representations and promises of payment made by Riptide and the Individual Defendants to induce Watson into entering the Supplement Agreement, when, in fact, no such payments were ever going to be made.

139.    Watson reasonably relied on the representations of Defendants Riptide and Wilde in entering into the Merger Agreement and the Employment Agreement for the consideration and on the terms set forth in those Agreements.

140.    As a result of the misrepresentations of Defendants Riptide and Wilde, Watson has been damaged in an amount to be determined at trial.

141.    In addition, the conduct of Defendants Riptide and Wilde as alleged herein was wanton, willful and malicious, and, therefore, Watson is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Defendants Riptide Worldwide, Inc. and Wilde in excess of Ten Million Dollars ($10,000,000) as compensatory damages and in the amount of Two Million Dollars ($2,000,000) as punitive or exemplary damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

## COUNT VII
### (Breach of Contract: Intellectus v. Riptide)

142.    Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 141 of this Complaint as if set forth in full in this Count VII.

143.    Intellectus and IP Holding Corp. entered into the written Software License, which is a valid, binding contract supported by adequate consideration.

144.    Although a putative party to the contract, IP Holding Corp. has never actually existed.

145.    Riptide is and was IP Holding Corp.'s parent company and was a fully disclosed principal in regard to the Software License.

146.    As IP Holding Corp.'s disclosed principal, Riptide is obligated to fulfill IP Holding Corp.'s obligations under the Software License and is liable for IP Holding Corp.'s failure to fulfill those obligations.

147.    Intellectus performed its obligations under the Software License by, among other things, conveying the Software to Riptide and has otherwise satisfied any conditions to the filing of this action.

148.    Riptide failed to perform and, thus, materially breached its obligations to Intellectus under the Software License.  Specifically,

   a.  Riptide has failed to make payment of $3,750,000 and the issuance of warrants for 450,000 shares of common stock, as required by the Software License;

   b.  Riptide damaged the marketability of the Software by providing deficient performance under both governmental and private contracts in which the use of the Software was a large part of the services provided;

   c.  Riptide failed to return the Software to Intellectus with the enhancements and the developments to the software that had been made in the preceding months to which Intellectus was entitled.

149.    Intellectus has been damaged by Riptide's failure to make the required payments and to issue the required warrants.

150.   In addition, as a direct and proximate result of Riptide's poor performance on these contracts, the Software is far less marketable than it was and than it should be, thereby causing damage to Intellectus in the form of reduced revenues and licensing fees.

151.   Finally, as a direct and proximate result of the destruction or withholding of the Software by Riptide, Wilde, and Loeffel, Intellectus has been deprived of the use and benefit of the further enhancement and development and has been forced to, at substantial cost and expense, undertake further development and enhancement of the Software that otherwise would have been available to it, in whole or in part, if the Software had been returned as required.

ACCORDINGLY, Intellectus demands judgment against Defendant Riptide Worldwide, Inc. in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest and the cost of this suit and such other and further relief as the Court deems proper.

## COUNT VIII
**(Negligent Misrepresentation: Intellectus v. Riptide and Individual Defendants)**

152.   Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 151 of this Complaint as if set forth in full in this Count VIII.

153.   Each of the Defendants owed Intellectus a duty of truthfulness and honesty in the negotiations that resulted in the Software License. This duty arose by virtue of the Defendants' superior knowledge of the financial status of Riptide and of IP Holding Corp., the lengthy negotiation between the parties, the intended long-term relationship between the parties, and the close and trusting relationship between the parties that arose during the negotiations.

154.   Material information provided to Intellectus during the negotiation of the Software License was incorrect. That information included, but is not limited to, the following:

    a.    the representation that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact,

Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

b. the representation that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

c. the representation that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d. the representation that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e. the representation that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f. the representation that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Intellectus; and

g. the representations and promises of payment made by Riptide and the Individual Defendants to induce Intellectus into entering the Supplement Agreement, when, in fact, no such payments were ever going to be made.

155. Each of these express representations was false, and Riptide and the Individual Defendants knew or should have known that they were false when made.

156. In addition, because of the duties then owed to Intellectus, Riptide and each of the Individuals Defendants had an affirmative duty to correct any misinformation that was provided.

36

However, Riptide and all of the Individual Defendants failed to correct the misinformation provided to Intellectus despite the fact that they all knew, or should have known, of the falsity of the information.

157.     Intellectus was unaware of the true facts and relied on the false and misleading statements made by Riptide and the Individual Defendants in entering into the Software License and the Supplemental Agreement and in carrying out its performance and accepting the consideration and terms set forth in those Agreements.

158.     As a direct and proximate result of the negligent misrepresentations made by Riptide and the Individual Defendants, Intellectus was injured and is entitled to damages in an amount to be determined at trial.

ACCORDINGLY, Intellectus demands judgment against Riptide Worldwide, Inc. and each of the Individual Defendants, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit and such other and further relief as the Court deems proper.

## COUNT IX
### (Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, As Amended: Intellectus v. Riptide and Wilde)

159.     Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 158 of this Complaint as if set forth in full in this Count IX.

160.     Defendants Riptide and Wilde knowingly and intentionally misrepresented and concealed from Intellectus material facts concerning the financial condition and prospects of Riptide, both during the negotiation of the Software License and thereafter, including, without limitation, in public filings with the Securities and Exchange Commission.

161.     Those representations include, but are not limited to, the following:

a. the representation that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

b. the representation that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

c. the representation that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d. the representation that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e. the representation that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger; and

h. the representation that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Intellectus.

162. The representations and omissions by the Defendants Riptide and Wilde set forth above were false and were known to be false when made and were made for the purpose of inducing Intellectus to rely on them.

163.   The representations set forth above were made in connection with the sale of securities by Riptide to Intellectus and, in making the representations, Defendants Riptide and Wilde employed the means and instrumentalities of interstate commerce and communication.

164.   Intellectus reasonably relied on the representations and omissions of Defendants Riptide and Wilde in entering into the Software License.

165.   These false representations by Defendants Riptide and Wilde are in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which prohibits any person from "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

   (a)   To employ any device, scheme or artifice to defraud,

   (b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

   (c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

166.   As a result of Defendants Riptide and Wilde's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Intellectus is entitled to damages in an amount to be determined at trial.

167.   In addition, the conduct of Defendants Riptide and Wilde, as alleged herein, was wanton, willful, and malicious, and, therefore, Intellectus is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Intellectus demands judgment against Defendants Riptide Worldwide, Inc. and Wilde in excess of Ten Million Dollars ($10,000,000) as compensatory damages and in the amount of Two Million Dollars ($2,000,000) as punitive or exemplary damages, together

with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

**COUNT X**
**(Violation of Section 20(a) of the Exchange Act of 1934,**
**As Amended:  Intellectus v. Wilde)**

168.    Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 167 of this Complaint as if set forth in full in this Count X.

169.    As set forth in detail above, Defendant Wilde knowingly and intentionally misrepresented and concealed from Intellects material facts concerning the financial condition and prospects of Riptide, both in negotiations of the Software License and thereafter and in public filings with the Securities and Exchange Commission.

170.    By virtue of his high-level position, ownership and contractual rights, participation and awareness of Riptide operations, Defendant Wilde had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Riptide, including the content and dissemination of the various statements that Intellectus alleges were false and misleading.  Wilde acted as the controlling person of Defendant Riptide within the meaning of Section 20(a) of the Exchange Act.

171.    Defendant Wilde violated Section 20(a) of the Exchange Act through the misrepresentations and omissions detailed above.  By virtue of his position as controlling person, he is liable pursuant to Section 20(a) of the Exchange Act.

172.    As a result of Defendant Wilde's violation of Section 20(a) of the Exchange Act, Intellectus has been damaged in an amount to be determined at trial.

173.   In addition, the conduct of Defendant Wilde, as alleged herein, was wanton, willful, and malicious, and, therefore, Intellectus is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Intellectus demands judgment against Defendant Wilde in excess Ten Million Dollars ($10,000,000) as compensatory damages and in the amount of Two Million Dollars ($2,000,000) as punitive or exemplary damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

### COUNT XI
**(Common Law Fraud:  Intellectus v. Riptide and Wilde)**

174.   Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 173 of this Complaint as if set forth in full in this Count XI.

175.   Defendants Riptide and Wilde knowingly and intentionally misrepresented and concealed from Intellectus material facts concerning the financial condition and prospects of Riptide at all relevant times, both in negotiation of the Software Agreement and thereafter.

176.   Such misrepresentations included, but are not limited to, the following:

   a.   the representation that Riptide's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when, in fact, Riptide had previously committed to issue substantially more than the disclosed number and class of shares;

   b.   the representation that Riptide was authorized to issue 20,000,000 preferred shares when, in fact, Riptide had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

   c.   the representation that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any

obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when, in fact, Riptide had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d.  the representation that Riptide had no Liabilities other than what was disclosed on its balance sheet, when, in fact, Riptide had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e.  the representation that Riptide's financial statements were correct in all respects, when, in fact, those statements failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f.  the representation that Riptide's minute books and corporate records were "complete and correct in all respects," when, in fact, Riptide's accounting records failed to disclose the company's crippling financial situation and that Riptide had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Intellectus; and

g.  the representations and promises of payment made by Riptide and Wilde to induce Intellectus into entering the Supplement Agreement, when, in fact, no such payments were ever going to be made.

177.    Intellectus reasonably relied on the representations of Defendants Riptide and Wilde in entering into the Software License for the consideration and on the terms set forth in those Agreements.

178.    As a result of the misrepresentations of Defendants Riptide and Wilde, Intellectus has been damaged in an amount to be determined at trial.

179.    In addition, the conduct of Defendants Riptide and Wilde as alleged herein was wanton, willful and malicious, and, therefore, Intellectus is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Intellectus demands judgment against Defendants Riptide Worldwide, Inc. and Wilde in excess of Ten Million Dollars ($10,000,000) as compensatory damages and in

the amount of Two Million Dollars ($2,000,000) as punitive or exemplary damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

### COUNT XII
### (Trespass to Chattels:  Intellectus v. Riptide, Wilde and Loeffel)

180.    Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 179 of this Complaint as if set forth in full in this Count XII.

181.    Riptide, Wilde and Loeffel intentionally interfered with Intellectus' rightful use and enjoyment of the Software and the Derivative Works.

182.    Riptide, Wilde and Loeffel intentionally removed or destroyed the Software and the Derivative Works from the servers in Bravera's possession.  Subsequently, despite repeated demand by Intellectus, neither Riptide, IP Holding of Corp., Wilde, or Loeffel have returned the Software or the Derivative Works to Intellectus.

183.    Pursuant to the Software License, Intellectus is entitled to use and enjoyment of the Software and the Derivative Works.

184.    The nonconsensual deletion and subsequent failure to return the Software and the Derivative Works by Riptide, Wilde and Loeffel was intentional and without justification and, therefore, constituted and continues to constitute a trespass to chattels on Intellectus' property.

185.    As a result of the conduct of Riptide, Wilde and Loeffel, Intellectus was deprived of the Derivative Works to which it was entitled and has suffered damages.

ACCORDINGLY, Intellectus demands judgment against Defendants Riptide Worldwide, Inc., Wilde and Loeffel in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest and the cost of this suit and such other and further relief as the Court deems proper.

## COUNT XIII
### (Conversion:  Intellectus v. Riptide, Wilde and Loeffel)

186.   Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 185 of this Complaint as if set forth in full in this Count XIII.

187.   Riptide, Wilde and Loeffel intentionally interfered with Intellectus' right to possess the Software and the Derivative Works.

188.   Riptide, Wilde and Loeffel intentionally removed or destroyed the Software and the Derivative Works from the servers in Bravera's possession.  Subsequently, despite repeated demand by Intellectus, neither Riptide, Wilde, nor Loeffel have returned the Software or the Derivative Works to Intellectus.

189.   Pursuant to the Software License, Intellectus is entitled to possession of the Software and the Derivative Works.

190.   The nonconsensual deletion and subsequent failure to return the Software and the Derivative Works by Riptide, Wilde and Loeffel was intentional and without justification and, therefore, constituted a conversion of Intellectus' property.

191.   In addition, the conduct of Defendants Riptide, Wilde and Loeffel as alleged herein was wanton, willful and malicious, and, therefore, Intellectus is entitled to punitive damages in an amount to be determined at trial.

192.   At the time of the conversion, the Software and the Derivative Works had a value in excess of Ten Million Dollars ($10,000,000).

ACCORDINGLY, Intellectus demands judgment against Defendants Riptide Worldwide, Inc. Wilde and Loeffel in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest, Two Million Dollars ($2,000,000) as punitive damages together with interest, and the cost of this suit and such other and further relief as the Court deems proper.

### COUNT XIV
**(Tortious Interference with Prospective Economic Advantage:
Intellectus v. Riptide, Wilde and Loeffel)**

193.     Intellectus realleges and incorporates the allegations contained in Paragraphs 1
through 192 of this Complaint as if set forth in full in this Count XIV.

194.     Intellectus had valuable prospective business relationships and business
opportunities with both governmental and private customers, including, but not limited to, the
United States Department of the Navy from which it had a reasonable expectation of continuing
these relationships and deriving future economic gain.

195.     Riptide was aware of these relationships.

196.     By negligently mismanaging Bravera's operations, which resulted in substantial
failures of performance by Bravera under both governmental and private contracts in which
Bravera was utilizing the Software as a part of the basis for its services, Riptide, Wilde and
Loeffel have tortiously interfered with and damaged Intellectus' existing and prospective
business relationships and business opportunities.

197.     Specifically, Bravera had diligently worked for years with government agencies
to build the reputation of its Software and Trademarks.  These efforts ultimately resulted in a
contract with Commander, Navy Installations Command ("CNIC") to be the designated
"Purchase Card" software solution for Navy Shore Installations worldwide.  Riptide, Wilde and
Loeffel's mismanagement of Bravera's contract with CNIC lead CNIC to cancel the $450,000
annual contract for non-performance and to terminate the use of the Software developed by
Bravera.  Because of Bravera's connection to Intellectus and the Software, such mismanagement
and the extremely high visibility of Riptide's failure to perform has precluded any future

opportunity for Intellectus to utilize the Software to perform contracts with CNIC or other departments or agencies of the federal government.

198.   In addition, the intentionally conversion of the Derivative Works to which Intellectus was entitled further damaged Intellectus' ability to market the Software, its services and its Trademarks.

199.   As a result of the conduct of Riptide, Wilde and Loeffel, Intellectus has suffered, and will continue to suffer, lost profits, other consequential damages, and harm to reputation.

200.   In addition, the conduct of Defendants Riptide, Wilde and Loeffel as alleged herein was wanton, willful and malicious, and, therefore, Intellectus is entitled to punitive damages in an amount to be determined at trial.

ACCORDINGLY, Intellectus demands judgment against Defendant Riptide Worldwide, Inc., Wilde and Loeffel in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest, Two Million Dollars ($2,000,000) as punitive damages together with interest, the cost of this suit, and such other and further relief as the Court deems proper.

## COUNT XV
### (Violation of Section 1030(a)(5)(A)(i) of the Computer Fraud and Abuse Act:  Intellectus v. Riptide, Wilde and Loeffel)

201.   Intellectus realleges and incorporates the allegations contained in Paragraphs 1 through 200 of this Complaint as if set forth in full in this Count XV.

202.   Pursuant to subsections (e)(1) and (2) of the Computer Fraud and Abuse Act (the "Act"), Intellectus' Software and the Derivative Works are a "protected computer" covered by the Act.

203.   Riptide, Wilde and Loeffel knowingly and intentionally transmitted (i.e. erased or removed) the Software and the Derivative Works from the servers that they returned to

Intellectus and, thereby, intentionally caused damage without authorization to Intellectus' "protected computer."

204.    Riptide actions occurred without authorization because, pursuant to the Software License, Riptide was required to return the Software and the Derivative Works to Intellectus.

205.    As a result of Riptide's intentional acts, Intellectus incurred substantial damage in that it has been deprived of the use and benefit of the Derivative Works and has been forced to, at substantial cost and expense, undertake further development and enhancement of the Software that otherwise would have been available to it, in whole or in part, if the Software had been returned as required.

ACCORDINGLY, Intellectus demands judgment against Defendant Riptide Worldwide, Inc. in excess of Ten Million Dollars ($10,000,000) as compensatory damages together with interest the cost of this suit, and such other and further relief as the Court deems proper.

### COUNT XVI
**(Fraudulent Conveyance Under New York Debtor and Creditor
Law Section 274:  Watson and Intellectus v. Riptide, Wilde and Loeffel)**

206.    Watson and Intellectus reallege and incorporate the allegations contained in Paragraphs 1 through 205 of this Complaint as if set forth in full in this Count XVI.

207.    Following the execution of the Merger Agreement and the Software License, Defendant Riptide made fraudulent transfers of funds to Wilde and Loeffel under the guise of bonuses and increased salaries (the "Transfers"), which Transfers served no legitimate purpose to Riptide, but rather served only to the benefit of Wilde and Loeffel.

208.    At the time of the Transfers, Wilde and Loeffel knew that Riptide was indebted to Watson and Intellectus as a result of Riptide's failure to make payments due under the Merger Agreement, the Employment Agreement and the Software License.

209.   The Transfers were made without fair consideration to Riptide and left Riptide with unreasonably small capital to continue its business.

210.   Accordingly, the Transfers constitute fraudulent conveyances within the meaning of New York Debtor and Creditor Law Section 274.

211.   As a result, Watson and Intellectus have been damaged and are entitled to an award in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Wilde, Loeffel and Riptide, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.  In turn, Intellectus demands judgment against Wilde, Loeffel and Riptide, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

### COUNT XVII
**(Fraudulent Conveyance Under New York Debtor and Creditor Law Section 275:  Watson and Intellectus v. Riptide, Wilde and Loeffel)**

212.   Watson and Intellectus reallege and incorporate the allegations contained in Paragraphs 1 through 211 of this Complaint as if set forth in full in this Count XVII.

213.   As set forth above, the Transfers made by Riptide to Wilde and Loeffel served no legitimate purpose to Riptide, but rather served only to benefit Wilde and Loeffel, themselves.

214.   At the time of the Transfers, Wilde and Loeffel knew that Riptide was indebted to Watson and Intellectus as a result of Riptide's failure to make payments due under the Merger Agreement, the Employment Agreement and the Software License.

48

215.    The Transfers were made without fair consideration to Riptide and, at the time the Transfers were made, Riptide was unable to pay its debts owing to Watson and Intellectus. Wilde and Loeffel also knew at the time of the transfers that Riptide was incurring additional debts to Watson under the Merger Agreement (relating to "earn-out" payments for performance goals by Bravera) and the Employment Agreement (relating to "earn-out" payments and salary) and to Intellectus under the Software License (relating to "earn-out" payments and scheduled payments).

216.    Accordingly, the Transfers constitute fraudulent conveyance within the meaning of New York Debtor and Creditor Law Section 275.

217.    As a result, Watson and Intellectus have been damaged and are entitled to an award in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Wilde, Loeffel and Riptide, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.  In turn, Intellectus demands judgment against Wilde, Loeffel and Riptide, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

## COUNT XVIII

### (Fraudulent Conveyance Under New York Debtor and Creditor Law Section 276:  Watson and Intellectus v. Riptide, Wilde and Loeffel)

218.    Watson and Intellectus reallege and incorporate the allegations contained in Paragraphs 1 through 217 of this Complaint as if set forth in full in this Count XVIII.

219.    As set forth above, the Transfers made to Wilde and Loeffel served no legitimate purpose to Riptide, but rather served only to benefit Wilde and Loeffel, themselves.

220.    The Transfers were made by Riptide to Wilde and Loeffel with actual intent to hinder, delay, or defraud Watson and Intellectus from recovering from Riptide the amount due pursuant to the Merger Agreement, the Employment Agreement and the Software License.

221.    Accordingly, the Transfers constitute fraudulent conveyances within the meaning of New York Debtor and Creditor Law Section 276.

222.    As a result, Watson and Intellectus have been damaged and are entitled to an award in an amount to be determined at trial.

ACCORDINGLY, Watson demands judgment against Riptide, Wilde and Loeffel jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.  In turn, Intellectus demands judgment against Riptide, Wilde and Loeffel, jointly and severally, in excess of Ten Million Dollars ($10,000,000) as compensatory damages, together with interest and the cost of this suit, including attorneys' fees for this action, and such other and further relief as the Court deems proper.

**Jury Trial Demand**

Watson and Intellectus respectfully request a trial by jury on all issues so triable.

Nicholas Fortuna (NF-9191)
Megan J. Muoio (JM-6121)
Allyn & Fortuna
200 Madison Avenue
Fifth Floor
New York, New York  10016

Attorneys for Plaintiffs

OF COUNSEL:

James E. Edwards, Jr.
Anthony F. Vittoria
Kelly M. Preteroti
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland   21202-1643
410-685-1120