UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CHRISTOPHER WATSON and :
INTELLECTUS, LLC, :
                       Plaintiffs, :
    - against - :
 :
RIPTIDE WORLDWIDE, INC. (F/K/A SHEA :
DEVELOPMENT CORP.), FRANCIS E. WILDE, :
TOMMY E. WHEELER, E. JOSEPH :
VITETTA, JR., RICHARD CONNELLY, and :
PHILIP E. LOEFFEL, :
 :
                      Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 7, 2012

11 Civ. 0874 (PAC)

<u>OPINION & ORDER</u>

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiffs Christopher Watson and Intellectus, LLC filed this action on February 8, 2011 asserting claims for breach of contract, tort, violations of the securities laws, and fraudulent conveyance against Defendants Riptide Worldwide, Inc. ("Riptide"), Francis Wilde, Tommy Wheeler, Joseph Vitetta, Jr., Richard Connelly, and Philip Loeffel.[1] Plaintiffs' allegations arise out of alleged misrepresentations Defendants made during merger negotiations with Plaintiffs in April 2007. Defendants Vitetta, Connelly, and Loeffel each filed motions to dismiss the Complaint. For the reasons discussed below, the Court grants Connelly and Vitetta's motions to dismiss Counts 3 and 8. Loeffel's motion to dismiss Counts 12 though 18 is granted in part and denied in part. Plaintiffs are granted leave to replead Counts 3, 8 and 18.

---

[1] Both Riptide and Wilde were served with a summons and the Complaint on March 29, 2011 and March 5, 2011, respectively. (Docket Nos. 9, 5.) Neither has answered nor has either filed motions to dismiss. On December 16, 2011, Defendant Wheeler filed for bankruptcy protection in the Middle District of Florida. (Docket No. 50.)

**BACKGROUND**

In March 2007, Defendants sought to acquire Watson's software company, Bravera, Inc. (Compl. ¶ 13.) On April 26, 2007, Watson, Riptide, and Bravera signed an "Agreement and Plan of Merger"[2] (the "Merger Agreement") setting forth the terms of the transaction. (Id. ¶ 14.) Under its terms, Bravera was to merge into Shea Development Acquisition No. 3 Corp., a special entity created by Riptide for the Merger, and Watson's shares of Bravera stock were to convert into shares of Riptide common stock. (Id. ¶¶ 16-17.) Watson was also to receive $1,500,000 in cash, as well as other consideration. (Id. ¶¶ 18-19.)

Before the transaction closed on July 16, 2007, the parties also entered into a Senior Management Employment Agreement (the ("Employment Agreement"),[3] dated July 15, 2007, which provided that Bravera would continue to employ Watson for three years, unless Watson terminated his employment with 30 days notice. (Id. ¶ 65-66.) Wilde and the Individual Defendants[4] represented to Watson that he would receive all compensation and benefits due to him under the Merger and Employment Agreements if his employment ended within the three year period for any reason other than for cause. (Id. ¶¶ 67-68.)

Plaintiffs also allege that Intellectus had intellectual property rights in certain software and trademarks which Bravera utilized. (Id. ¶¶ 70-71.) As part of the Merger, Riptide sought exclusive rights to the software and trademarks, and entered into a Software License and Asset

---

[2] The Merger Agreement is attached to the Complaint as Exhibit 1.

[3] The Employment Agreement is attached to the Complaint as Exhibit 2.

[4] The "Individual Defendants" include Riptide's Chairman and CEO, Wilde, as well as Wheeler, President and Vice President of Mergers and Acquisitions, Vitetta, Senior Vice President and Corporate Secretary, and Connelly, Chief Financial Officer of Riptide. The Complaint does not include Loeffel among the Individual Defendants who participated in the merger negotiations.

Purchase Agreement (the "Software License")[5] with Intellectus through its subsidiary, IP Holding of Nevada Corp. ("IP Holding") (Id. ¶¶ 72-73.)  In exchange for a license to use, market, modify, and further develop the software, IP Holding was to provide Intellectus with 450,000 warrants to purchase Riptide Stock, as well as specified cash payments and "earn out" payments.  (Id. ¶¶ 74-76.)  The Software License contemplated that IP Holding would continue to create "derivative works" of the software during the term of the license, and that if IP Holding materially breached the agreement, all rights to the derivative works would revert to Intellectus.  (Id. ¶¶ 77-78.)

### A. Defendants' Alleged Misrepresentations

During their negotiations, the Individual Defendants made representations about Riptide's capital structure and outstanding obligations.[6]  (Id. ¶¶ 4-7, 21, 22.)  These representations were incorporated into the Merger Agreement.  Plaintiffs contend that these representations were false, and that the Individual Defendants "knew, or should have known, that Riptide had more shares outstanding and had committed itself to issue more shares than were disclosed to Watson in [the Merger Agreement]."  (Id. ¶ 24.)

According to Plaintiffs, on July 12, 2007, Riptide amended its Articles of Incorporation to increase the authorized number of shares of its preferred stock "from 20,000,000—the amount

---

[5] The Software License is attached to the Complaint as Exhibit 3.

[6] Specifically, the Individual Defendants represented to Plaintiffs that Riptide "had issued only 24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock, respectively." (Compl. ¶ 21.) Plaintiffs allege that the Individual Defendants also told Watson that there were "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Riptide] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock." (Id. ¶ 22.)

Riptide represented in . . . the Merger Agreement—to 60,000,000." (Id. ¶ 27.) On July 13, 2007, "immediately prior to the closing of the merger," Riptide entered into a Securities Purchase Agreement (the "SPA") with two investors.[7] (Id. ¶ 25.) The SPA obligated Riptide to issue an additional 12,797,500 shares of Riptide common stock and warrants to purchase 3,500,000 shares of Riptide common. (Id.) On the same day, Riptide issued an additional 1,000,000 shares of Series A convertible preferred stock and altered the price of that stock. (Id. ¶ 28.) Riptide also entered into a "Series B Preferred Stock Purchase Agreement" with other investors on July 13, 2007. Watson contends that neither Riptide nor the Individual Defendants informed him of these developments before the Merger closed on July 16, 2007. (Id. ¶¶ 29, 32.)

The Complaint alleges that during the Merger negotiations, the Individual Defendants also misrepresented Riptide's outstanding debts and liabilities. (Id. ¶¶ 34-35.) According to Plaintiffs, Riptide incurred "significant commitments" and expenses under the SPA and Series B Preferred Stock Purchase Agreement. (Id. ¶¶ 36-37.) In addition, the minute books and records provided to Watson during due diligence "either did not reflect these transactions or inaccurately depicted Riptide's actions." (Id. ¶ 51.)

  B.  Post-Merger

Watson alleges that when the Merger closed, Riptide failed to pay him the full cash consideration due, and that as a result of the SPA, which improperly diluted Riptide's common

---

[7] This Securities Purchase Agreement is currently the subject of a pending action naming Riptide, Bravera, IP Holdings, Wilde, Wheeler, Vitetta, and Connelly as defendants. See Camofi Master LDC v. Riptide Worldwide, Inc., No. 10 Civ. 4020(CM), 2011 WL 1197659 (S.D.N.Y. Mar. 25, 2011). In Camofi, plaintiffs allege that defendants made various misrepresentations during due diligence, in the transaction documents, and in Riptide's SEC filings. Their compliant alleges various causes of action for breach of the SPA, the Exchange Act, and fraudulent conveyance under New York state law. The court denied defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

stock, the Riptide shares and warrants he received were "worthless." (Id. ¶¶ 57-61.) In addition, Watson alleges that he terminated his employment with Bravera on October 29, 2007, with the required thirty days' notice, and that Riptide has not paid him any of the compensation and benefits to which he is entitled under the Employment Agreement. (Id. ¶ 69.)

Plaintiffs also allege that Riptide "substantially mismanaged Bravera's operations," which caused Bravera to fail to perform under its contracts with third parties. (Id. ¶ 83.) In addition, the Defendants failed to return software and derivative works to Intellectus. Plaintiffs contend that Riptide, at Loeffel's direction, delivered to Watson various computer servers from which the software and derivative works had been removed. (Id. ¶¶ 88-89.) The parties began fighting almost from the beginning, and the net result has been litigation rather than a successful merger.

## DISCUSSION

I. Standard of Review

In considering a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). A court need not accept as true, however, "[l]egal conclusions, deductions or opinions couched as factual allegations." In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1960 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In determining the sufficiency of a complaint, the Court may consider "the factual allegations in [the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993).

A. Defendant Connelly's Motion to Dismiss

Connelly argues that Plaintiffs' claims for negligent misrepresentation (Counts 3 and 8) fail because (1) the Complaint does not allege facts to show a "special relationship" existed between Plaintiffs and Connelly; (2) there are no allegations that Connelly had "specialized knowledge" upon which Plaintiffs justifiably relied; (3) the allegations are duplicative of Plaintiffs' breach of contract claims; and (4) Plaintiffs fail to plead their claim with sufficient particularity. Vitetta, appearing *pro se*, adopts Connelly's legal arguments.[8] (See Vitetta Br. at 4.) As the allegations against Vitetta are the same as those against Connelly, the Court's discussion and decision with respect to these Counts applies equally to Vitetta.

1. Negligent Misrepresentation

To state a claim for negligent misrepresentation, a plaintiff must allege that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a

---

[8] To the extent Vitetta addresses "each claim in 'factual' terms and not in the 'legal' terms," (Vitetta Mem. at 4), these arguments are inappropriate on a motion to dismiss pursuant to Rule 12(b)(6). See Iqbal, 129 S.Ct. at 1960.

      serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Naughright v. Weiss, No. 10 Civ. 8451(RWS), 2011 WL 5835047, at *6 (S.D.N.Y. Nov. 18, 2011) (citing Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)). Negligent misrepresentation "is a type of fraud and, as such, is subject to Rule 9(b)'s heightened pleading standard."[9] Id. (quotation omitted).

      Liability for negligent misrepresentation is imposed "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmel v. Schaefer, 89 N.Y.2d 257, 263 (1996). In a commercial case, where the speaker's status as a professional does not trigger a special relationship, "there must be some identifiable source of a special duty of care" before tort liability will attach. Id. at 264. In this context, a plaintiff must establish "something beyond an ordinary arm's length transaction." Dandong v. Pinnacle Performance Ltd., No. 10 Civ. 8086(LBS), 2011 WL 5170293, at *15 (S.D.N.Y. Oct. 31, 2011) (dismissing negligent misrepresentation claim against defendant who selected collateralized debt obligations where "the relationship between Defendants and Plaintiffs was that of an ordinary buyer and seller, which is not 'special' under New York law"); see Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 779-80 (S.D.N.Y. 2011) (finding no special relationship where the transaction between the parties "is alleged to have been nothing more than an arm's length business arrangement between sophisticated and experienced parties," and citing cases); cf. Suez

---

[9] Although the Second Circuit has not decided whether Rule 9(b) applies to negligent misrepresentation claims, see Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 188 (2d Cir. 2004), many courts in this district have concluded that a plaintiff must satisfy the heightened pleading standard for negligent misrepresentation claims premised on fraudulent conduct. See, e.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., No. 08 Civ. 2437(RJS), 2011 WL 6034310, at *25 (S.D.N.Y. Dec. 5, 2011).

7

Equity Inv. L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001) (finding special relationship where "defendants initiated contact with plaintiffs, induced them to forebear from performing their due diligence, and repeatedly vouched for the accuracy of the allegedly deceptive information").

Here, Plaintiffs fail to allege a duty arising out of a special relationship with Connelly. Even if the nearly three-month-long merger negotiations between Plaintiffs and Riptide were sufficient to trigger a special relationship, the Complaint does not state what role, if any, Connelly had in negotiating the Merger Agreement and Software License; the specific representations he made to Plaintiffs; or whether he held himself out as having expertise in order to induce Plaintiffs' trust.  Indeed, Connelly's name appears only once in the Complaint, where Plaintiffs allege that he was the Chief Financial Officer of Riptide.  (Compl. ¶ 7.)  Without more, there is no basis to find that Connelly had a special relationship with Plaintiffs.  Plaintiffs have therefore failed to plead Counts 3 and 8 with sufficient particularity to satisfy Rule 9(b).  The same reasoning and result apply to Vitetta.

    2. Group Pleading Doctrine

Plaintiffs argue, however, that under the "group pleading" doctrine, the Individual Defendants' false representations are attributable to Connelly due to his status as Riptide's CFO.  (See Pl's Mem. in Opp. to Connelly Mo. to Dismiss, at 7-9.)  The group pleading doctrine provides a limited exception to the particularity requirement of Rule 9(b) "where defendants have collaborated on or approved a document together and the document is the basis for the liability." Adelphia Recovery Trust v. Bank of America, N.A., 624 F. Supp. 2d 292, 315 (S.D.N.Y. 2009).  Under this doctrine, a plaintiff "can rely on a presumption that statements in

prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of individuals with direct involvement in the everyday business of the company." In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (internal quotation omitted). The Second Circuit has suggested that a corporate officer defendant must have active involvement in the transaction at issue for the group pleading doctrine to apply. See Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986) ("[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders . . . participating in the offer of the securities in question."); see also Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 238 (S.D.N.Y. 2000) (group pleading doctrine satisfied where tender offer documents showed that defendants "were intimately involved both in negotiating the offer and in drafting the allegedly fraudulent Solicitation and Tender Offer Statement"). Lastly, the group pleading doctrine "applies only to written statements." In re Optimal U.S. Litig., No. 10 Civ. 4095(SAS), 2011 WL 6424988, at *12 (S.D.N.Y. Dec. 11, 2011).

Plaintiffs fail to satisfy the requirements of the group pleading doctrine. The Complaint alleges that the Individual Defendants made false representations "[d]uring the [merger] negotiations" about Riptide's capitalization and outstanding shares, and that these representations were subsequently incorporated into the Merger Agreement. (See, e.g., Compl. ¶ 21, 22, 34.) In essence, Plaintiffs claim that they relied on Defendants' representations made during negotiations, and that the Merger Agreement and Software License merely codified those representations. "The group pleading doctrine does not apply to oral statements, and so cannot be relied on to link oral statements made during due diligence or negotiations concerning" the Merger Agreement or Software License to Connelly. See Camofi, 2011 WL 1197659, at *9; see

9

also In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 166, 192 (S.D.N.Y. 2003) (finding that statements in press release were attributable to CFO, but that individual defendants' oral statements about the company's "healthy balance sheet" and "pro forma net debt that [was] practically non-existent" "do not fall within the ambit of the group pleading doctrine").

Even if the alleged fraudulent misrepresentations in the Merger Agreement qualified as "group published information," see In re Oxford Health Plans, Inc., 187 F.R.D. at 142, Plaintiffs do not allege any facts that show what level of involvement Connelly had in the transaction.[10] Accordingly, Plaintiffs cannot rely on the group pleading doctrine to avoid meeting the requirements of Rule 9(b). Counts Three and Eight are therefore dismissed as against Connelly and Vitetta with leave to replead.[11]

B. Loeffel's Motion to dismiss

Loeffel argues that Plaintiffs' tort claims in Counts 12 and 13, as well as their claim under the Computer Fraud and Abuse Act in Count 15, are time barred under the parties' Software License. In the alternative, he argues that Plaintiffs cannot hold him liable individually because the Complaint does not allege that Loeffel acted for personal profit to the detriment of Riptide. Loeffel also argues that Plaintiffs are collaterally estopped from relitigating issues

---

[10] The Complaint is equally deficient with respect to Vitetta in this regard; his name appears only once in the Complaint, where Plaintiffs allege that he was "the Senior, and later Executive, Vice President and Corporate Secretary of Riptide." (See Compl. ¶ 6.)

[11] Connelly's argument that the negligent misrepresentation claims should be dismissed because they duplicate the breach of contract claims is misplaced. "[A] cause of action for fraud can be maintained on the basis of allegations that a party made a collateral or extraneous representation that served as an inducement to the contract." Gruber v. Victor, No. 95 Civ. 2285(JSM), 1996 WL 492991, at *6 (S.D.N.Y. Aug. 28, 1996) (quoting PI, Inc. v. Quality Prods, Inc., 907 F. Supp. 752, 761 (S.D.N.Y. 1995).

arising from the Software License.  Lastly, Loeffel moves to dismiss Counts 14 and 16 through 18 for failure to state a claim.

    1.   Statute of Limitations

The Software License provides that "Any cause of action or claim of Licensee or Owner, accrued or to accrue because of any breach or default by the other party of any provision of this Agreement, shall survive the termination or expiration of this Agreement for a period of two (2) years."  (Compl. Ex. 3, at ¶ 5.)  The Software License also provides that New York law shall govern any disputes arising under the agreement.

New York law allows parties to contractually shorten the period of limitations.  See N.Y. C.P.L.R. § 201 ("An action . . . must be commenced within the time specified in this article unless a different time is prescribed by law or a shorter time is prescribed by written agreement.").  Courts will enforce a contractually shortened limitations period so long as it is reasonable and not against public policy or obtained through fraud, duress, or wrongdoing.[12] See, e.g., Vega v. Federal Exp. Corp., 09 Civ. 07637(RJH)(GWG), 2011 WL 4494751, at *6 (S.D.N.Y. Sept. 29, 2011).  The intention to establish a shorter period must also be clearly set forth in the agreement.  Id.  "Such an agreement bars tort claims—including claims for gross negligence—as well as contract claims" brought outside the shortened period.  Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgt. Inc., 915 N.Y.S.2d 7, 15 (N.Y. App. Div. 1st Dep't 2010).

---

[12] The parties do not dispute that the two-year limitations period set forth in the Software License is reasonable.

Plaintiffs argue that the shortened limitations period under the License Agreement does not apply because their claims relating to destruction of software sound in tort, not contract, and thus trigger separate legal duties. (Pl's Mem. in Opp. to Philip Loeffel's Mo. to Dismiss at 10 (citing New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316 (1995)).)  This argument is wrong.  Although "a contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract," Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551 (1992) (internal quotation omitted), tort claims that "merely parallel the breach of contract claim" do not constitute "distinctly separate causes of action." RKB Enters. Inc. v. Ernst & Young, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 3d Dep't 1992) (affirming dismissal of negligence claim where plaintiff's allegations "merely parallel" breach of contract claim).  Plaintiffs' tort claims in Counts 12 and 13 flow from Loeffel's alleged destruction of the Derivative Works and Software.  According to the Complaint, the Software License, not tort law or the Computer Fraud and Abuse Act, created Riptide's duty to return the software and derivative works to Intellectus.  (See Compl. ¶¶ 183, 189, 204.)  The injury is essentially the same as that alleged in Count Seven for Breach of the Software License, which suggests that Plaintiffs are seeking the benefit of their bargain under that agreement.  See Sommer, 79 N.Y.2d at 552 (stating that "[i]n disentangling tort and contract claims, we have also considered the nature of the injury, the manner in which the injury occurred and the resulting harm" and that "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory").  As such, Counts 12 and 13 parallel Plaintiffs' breach of contract claim and are subject to the parties' shortened limitations period for any claims that accrue "because of any breach or default" of the Software License.  They are dismissed as time-barred against Loeffel.

Plaintiffs concede that Count 15 is also time barred under the two-year statute of limitations in the Computer Fraud and Abuse Act.  See 18 U.S.C. § 1030(g) ("No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of discovery of the damage.").  The Court has considered Plaintiffs' equitable tolling arguments and finds that they are without merit.  Count 15 is therefore dismissed.  The Court need not consider Loeffel's remaining arguments as to these Counts.

    2.   Tortious Interference with Prospective Economic Advantage

Loeffel argues that Count 14 of the Complaint fails to state a claim for tortious interference with prospective economic advantage.  To plead a claim for this tort under New York law, a plaintiff must allege: "(1) that [he] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  Friedman v. Coldwater Creek, Inc., 321 Fed.Appx. 58, 60 (2d Cir. 2009) (quoting Kirch v. Liberty Media Corp., 449 F.3d 388 (2d Cir. 2006)).  A complaint must also include a "sufficiently particular allegation of interference with a specific contract or business relationship" of the plaintiff.  Envirosource, Inc. v. Horsehead Res. Devel. Co., Inc., No. 95 Civ. 5106(AGS), 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (quoting McGill v. Parker, 582 N.Y.S.2d 91, 95 (N.Y. App. Div. 1st Dep't 1992)).  "The defendant's interference must be direct:  the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff."  B&M Linen, Corp. v. Kannegeisser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (internal quotation omitted).  Moreover, "[a]s a general rule, the defendant's conduct must

amount to a crime or an independent tort" to constitute tortious interference with prospective economic advantage. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004).

Plaintiffs allege that Intellectus had business relationships "with both government and private customers, including but not limited to, the United States Department of the Navy," and that it had "a reasonable expectation of continuing these relationships and deriving future economic gain." (Compl. ¶ 194.) According to the Complaint, Defendants Riptide, Wilde and Loeffel interfered with Bravera's contract with Commander, Navy Installations and Command to provide software for Navy Shore Installations worldwide. (Id. ¶ 197.) Intellectus was not a party to that contract. Although the Complaint states that Riptide "was aware" of Intellectus's business relationships with the government and private consumers, (Compl. ¶ 195), Plaintiffs do not allege that Defendants intentionally interfered with those relationships. Rather, the Complaint generally alleges that Riptide, Wilde and Loeffel tortiously interfered with Intellectus' "existing and prospective business relationships and business opportunities" by "negligently mismanaging Bravera's operations, which resulted in substantial failures of performance by Bravera under both governmental and private contracts in which Bravera was utilizing the Software as a part of the basis for its services." (Compl. ¶ 196.) These allegations fall short of the level of culpability required to state a claim for tortious interference with prospective economic advantage. See Carvel Corp., 3 N.Y.3d at 190; B&M Linen, Corp., 679 F. Supp. 2d at 485 (dismissing tortious interference claim where plaintiff "has not even tried to allege that defendants intended to disrupt its business relationships" with third parties). Count 14 of the Complaint is therefore dismissed with prejudice as against Loeffel.

3. Fraudulent Conveyance

Lastly, Loeffel argues that Counts 16 through 18 fail to allege violations of the N.Y. Debtor and Creditor Law ("DCL"), and that Plaintiffs fail to plead fraud with particularity as required under Rule 9(b).  Specifically, Loeffel argues that Plaintiffs fail to allege that bonuses and increased salaries (the "Transfers) were not received in good faith or that Loeffel was not entitled to the funds as compensation for his successful performance.  (Loeffel Mem. at 22.)

(a)  Constructive Fraudulent Conveyance

Under the DCL, a debtor's conveyance is deemed constructively fraudulent if it is made without "fair consideration" and if any one of the following conditions is met:

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur a debt beyond its ability to pay . . . .

In re Sharp Int'l. Corp., 403 F.3d 43, 53 (2d Cir. 2005).  "Fair consideration" exists when the following criteria are met: "(1) . . . the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be 'in good faith.'"  Id. (quoting HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1058-59 (2d Cir. 1995)).

(b)  Intentional Fraudulent Conveyance

DCL § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. DCL §

15

276.  "[T]o prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor."[13] In re Sharp Int'l Corp., 403 F.3d at 56 (citation omitted).  A plaintiff must also plead allegations of intent to defraud with particularity as required by Rule 9(b).  Id.  Given the difficulty of proving actual intent, a plaintiff may allege actual intent through circumstantial evidence, or "badges of fraud."  Camofi Master LDC v. Riptide Worldwide, Inc., No. 10 Civ. 4020(CM), 2011 WL 1197659, at *11 (S.D.N.Y. Mar. 25, 2011).  These "badges of fraud" include:

> (1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance.

Id. (citing Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d 244, 247-48 (N.Y. App. Div. 1st Dep't 1999).  In addition to alleging facts that give rise to a "strong inference of fraudulent intent," to satisfy Rule 9(b), a complaint "must specify the 'particulars' of the alleged fraud—including, for example, the time, place, particular individuals involved, and specific conduct at issue."  United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002) (citation omitted).

In Camofi, which involves the same defendants and related facts, plaintiffs alleged that Riptide, Wilde, Wheeler, Vitetta, and other defendants knew that plaintiffs were owed money under the Securities Purchase Agreement, "but nonetheless allowed transfers of money (for

---

[13] Although several bankruptcy court decisions in this district suggest that Section 276 of the DCL requires a plaintiff to plead both a transferor's and a transferee's fraudulent intent, see In re Bernard L Madoff Inv. Sec. LLC, No. 11 MC 0012(KMW), 2011 WL 3897970, at *5 (S.D.N.Y. Aug. 31, 2011) (citing cases), the Second Circuit "makes no mention of a transferee's fraudulent intent" under that statute.  Id. at *6 (citing In re Sharp Int'l Corp., 403 F.3d at 56).

bonuses, salaries, and fees) to be made." 2011 WL 1197659, at *11.  Specifically, plaintiffs first alleged that Wheeler and Vitetta "paid themselves bonuses and received an increase in salary" as though Riptide exceeded its projected pre-tax earnings for 2008, when in fact the company did not exceed those projections.  Id.  Second, plaintiffs alleged that Wheeler and Vitetta received these salary increases and bonuses while Riptide Worldwide was heavily indebted to plaintiffs, and that these salary payments "left the company with an unreasonably small amount of capital to operate."  Id.  Lastly, plaintiffs alleged that during this time, defendants made payments to a law firm where defendant Wilde's brother-in-law is a partner, and that those payments were in excess of the work performed for Riptide.  Id.

The court found that these allegations sufficiently stated a claim for violations of Sections 274 and 275 of the DCL:  "Plaintiffs have alleged facts tending to show that Vitetta and Wheeler caused Riptide Worldwide to make certain payments that forced the company to operate with a small amount of capital and that left the company unable to pay its mounting debt."  Id. at *15.  The court also found that plaintiffs' allegations "tend to show two 'badges of fraud': the inadequacy of the consideration received by Riptide Worldwide for the bonuses and fees it paid, and (2) the suspicious timing of these payments after the company incurred a substantial amount of debt."  Id. at *11.  These allegations provided circumstantial evidence of actual intent and were sufficient to maintain a claim under DCL § 276.  Id.

Here, Plaintiffs allege that after the Merger Agreement and Software License were executed, Riptide fraudulently transferred funds to Wilde and Loeffel "under the guise of bonuses and increased salaries."  (Compl. ¶ 207.)  The Transfers "served no legitimate purpose to Riptide, but rather served only to the benefit of Wilde and Loeffel."  (Id. ¶¶ 207, 213.)

17

Plaintiffs contend that at the time of the Transfers, Loeffel knew that Riptide owed money to Watson and Intellectus "as a result of Riptide's failure to make payments due under the Merger Agreement, the Employment Agreement, and the Software License." (Id. ¶¶ 208, 214.) The Complaint alleges that Wilde and Loeffel also knew that Riptide was incurring additional debts to Watson and Intellectus relating to "earn-out" payments set forth in the Merger and Employment Agreements, as well as the Software License. (Id. ¶ 215.) Plaintiffs allege that the Transfers "were made without fair consideration to Riptide and left Riptide with an unreasonably small capital to continue its business." (Id. ¶ 209.) These allegations are sufficient to state a claim for fraudulent transfer under Sections 274 and 275 of the DCL, as Plaintiffs allege that Wilde and Loeffel, acting as Riptide's chief executives, left the company unable to continue its business and meet its obligations to Plaintiffs. See Camofi, 2011 WL 1197659, at *12.

With respect to Plaintiffs' claim under § 276 of the DCL, the Complaint displays two "badges of fraud" that give rise to a strong inference of fraudulent intent. Plaintiffs allege that Loeffel and Wilde were both corporate insiders,[14] and that the Transfers took place "following the execution of the Merger Agreement and Software License." (Compl. ¶¶ 4, 8, 207.) The "suspicious timing" of the Transfers, combined with Loeffel's status as an executive of Riptide, suggest "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." In re Sharp Int'l Corp., 403 F.3d at 56.

---

[14] The Complaint alleges that Loeffel became Chief Development Officer of Riptide in July 2009 and that he "has also served as the President of Riptide Worldwide." (Compl. ¶ 8.) The Complaint does not specify when he served as President of Riptide, however.

The Complaint, however, fails to include the "particulars" of the allegedly fraudulent transactions between Riptide and Loeffel.[15] Plaintiffs do not specify when the defendants executed the Transfers, the amounts of the Transfers, by what mechanism the funds were transferred, or the source of the funds.[16] See Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp., No. 04 Civ. 4971, 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006) (dismissing claims of actual fraud under DCL § 276 pursuant to Rule 9(b) where complaint did not "identify how many transfers plaintiff is challenging or the specific dates and amounts of those transfers"); United Feature Syndicate, Inc., 216 F. Supp. 2d at 221 (dismissing fraudulent conveyance claim pursuant to Rule 9(b) where plaintiffs alleged "facts giving rise to a strong inference of fraudulent intent" but failed to allege "particulars," such as "the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, or the consideration paid"). Accordingly, Count 18 is dismissed as against Loeffel pursuant to Rule 9(b), with leave to replead.

## **CONCLUSION**

For the foregoing reasons, the Court grants Defendant Vitetta's and Connelly's motions to dismiss Counts 3 and 8 for failure to plead negligent misrepresentation. Plaintiffs have leave to replead these counts in order to allege the specific nature of the alleged misrepresentations and

---

[15] At the outset of their brief, Plaintiffs ask the Court to disregard Loeffel's declarations and "plethora of extrinsic materials" as improper on a motion to dismiss. (Pl's Mem. in Opp. to Loeffel Mo. to Dismiss at 6). Plaintiffs then argue, however, that this documentation supports Plaintiffs' fraudulent transfer allegations and "requires that the Plaintiffs be permitted to conduct discovery as to these claims." (Id. at 23.) Plaintiffs cannot have it both ways. To the extent that Plaintiffs rely on Loeffel's submissions for additional facts to support their claims, the Court will not consider these arguments. See Iqbal, 129 S.Ct. at 1944; Brass, 987 F.2d at 150.

[16] Although the court in Camofi found that plaintiff's allegations raised an inference of intent, the court did not assess whether the facts were pleaded with particularity in order to satisfy Rule 9(b).

the degree to which these Defendants were involved in the transaction. Counts 12, 13, and 15 are time-barred and are dismissed with prejudice as against Loeffel. Count 14 is also dismissed with prejudice for failure to state a claim as against Loeffel. Count 18 is dismissed pursuant to Rule 9(b) with leave to replead.

The Clerk of Court is directed to terminate these motions at Docket Nos. 10, 29, and 44. Plaintiffs may have until March 9, 2012 to file an amended complaint. The Court will hold a pretrial conference in this case on Wednesday, March 21, 2012 at 3:45 p.m. to discuss whether to adopt a civil case management plan or if Defendants intend to renew their Rule 12(b)(6) motions.

Dated: New York, New York
February 7, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

Copy Mailed By Chambers To:

E. Joseph Vitetta, Jr.
260 Ambleside Chase
Alpharetta, GA 30022