UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CHRISTOPHER WATSON and                  :
INTELLECTUS, LLC,                       :
                            Plaintiffs, :
             - against -                :
                                        :
RIPTIDE WORLDWIDE, INC. (F/K/A SHEA     :
DEVELOPMENT CORP.), FRANCIS E. WILDE,   :
TOMMY E. WHEELER, E. JOSEPH             :
VITETTA, JR., RICHARD CONNELLY, and     :
PHILIP E. LOEFFEL,                      :
                                        :
                            Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: February 4, 2013

11 Civ. 0874 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Christopher Watson ("Watson") and Intellectus, LLC ("Intellectus") filed this action on February 8, 2011, asserting a wide variety of claims against defendants Riptide Worldwide, Inc. ("Riptide"), Francis Wilde ("Wilde"), Tommy Wheeler ("Wheeler"), Joseph Vitetta, Jr. ("Vitetta"), Richard Connelly ("Connelly," and, collectively, the "Riptide Defendants"), and Phillip Loeffel ("Loeffel"), arising out of a corporate merger and related negotiations occurring in April 2007. On February 7, 2012, the Court dismissed Plaintiffs' claims for negligent misrepresentation, torts, violations of the Computer Fraud and Abuse Act, tortious interference with prospective economic advantage, and violations of § 276 of the New York Debtor and Creditor Law ("DCL"). Watson v. Riptide Worldwide, Inc., No. 11 Civ. 874, 2012 WL 383946 (S.D.N.Y. Feb. 7, 2012). Plaintiffs filed an Amended Complaint (the "Complaint") on March 10, 2012, which included, *inter alia*, claims for negligent misrepresentation against Connelly and Vitetta (counts III and VIII) and fraudulent conveyance against Loeffel under DCL § 276 (count XVIII). Defendants Vitetta, Connelly and Loeffel filed motions to dismiss these claims on April 23, 2012. On November 14, 2012, default judgment

1

was entered against Riptide and Wilde in the amount of $18,853,897.  For the reasons set forth

below, Count III is partially dismissed, and Count VIII and XVIII are dismissed in their entirety.

## BACKGROUND

### I.    The Parties

Watson founded and owned Bravera, Inc. ("Bravera"), which markets computer software

and services.  He also owns 94% of Intellectus, the owner of intellectual property at issue in this

case.

Riptide is a Florida corporation.  Wilde served as the Executive Chairman of its Board of

Directors and as its Chief Executive Officer.  Wheeler served as its Vice President of Mergers

and Acquisitions and as its President.  Vitetta served as its Corporate Secretary, as well as its

Senior Vice President, and subsequently as its Executive Vice President.  Connelly served as its

Chief Financial Officer.

Loeffel served as the Chief Executive Officer of Riptide Software, Inc. ("Riptide

Software"), a company that was acquired by Riptide at an unspecified date.  After its acquisition,

Riptide hired Loeffel to serve as its President.

### II.    The Parties' Negotiations

Through Wilde, Riptide first expressed an interest in acquiring Bravera in March, 2007,

as part of its plan to acquire several software companies and benefit from their purported

synergies.  After purchasing a company called Information Intellect, it subsequently targeted

Bravera and Riptide Software, among others.  On March 30, 2007, Watson and Riptide executed

a letter of intent which specified that Watson would be employed by Riptide for a minimum of

three years following the potential merger of Riptide and Bravera.

Throughout April 2007, Watson engaged in correspondence and phone calls with Vitetta, Wheeler, Wilde and Connelly regarding what would eventually become the Agreement and Plan of Merger (the "Merger Agreement").  The Merger Agreement was executed on April 26, 2007, though the merger did not actually take place until July 16, 2007.[1]  In addition, between May and July, 2007, Watson negotiated his Senior Management Employment Agreement (the "Employment Agreement") and Intellectus's Software License and Asset Purchase Agreement (the "Software License") with Wheeler, Connelly, Wilde and Vitetta.  Between the execution of the Merger Agreement and the merger's closing, Watson became intimately involved in Riptide's affairs and worked closely with Riptide executives.

## III.    The Merger Agreement

Watson alleges that the Riptide Defendants made myriad misrepresentations in the Merger Agreement, which specified that it was to be accurate as of the closing date of July 16, 2007, and that he relied on those misrepresentations in his decision to enter into the transaction. First, the Merger Agreement specified that Riptide had issued only "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" and that there were "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Riptide] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock."  Compl. Ex. 1 ¶ 3.2.  However, on July 12, 2007, Riptide amended its Articles of Incorporation to increase the authorized number of shares of preferred stock from 20,000,000, as specified in the Merger Agreement, to 60,000,000.  On July 13, 2007, Riptide altered the price and issued an additional 1,000,000 shares of Series A Preferred Stock, and issued 4,600,000 shares of Series B Preferred Stock, which could be converted at any time into 9,200,000 shares

---

[1] The Complaint states that "After April 26, 2007, each of the Individual Defendants remained actively involved in the negotiation and finalizing [sic] of the Merger Agreement," Compl. ¶ 34, but it does not assert that the Merger Agreement was subsequently amended to reflect the resolution of any post-execution negotiations.

of common stock.  On July 13, 2007, Riptide obligated itself to issue an additional 12,797,500 shares of common stock and warrants to purchase 3,500,000 shares of common stock.  Watson was never informed of these actions.  At the closing, Watson was to have received 3,000,000 newly issued shares of Riptide's common stock, a grant of 5,000,000 shares that would vest over a period of three years, and warrants to purchase an additional 2,937,500 shares.  As a result of the stock's dilution and a prohibition on Watson's ability to sell or transfer his shares, however, Watson alleges that the shares and warrants he received were "worthless."  Compl. ¶¶ 116-17.

Second, the Merger Agreement represented that "Riptide did not have any extraordinary debts, liabilities or obligations," id. at ¶90 (citing Compl. Ex. 1 at § 3.4(b)), and that the company's financial statements were "correct and complete in all material respects."  Compl. Ex. 1 at § 3.4(a).  But on July 13, 2007, without Watson's knowledge, Riptide agreed to issue $7,222,222.22 in debt, which it would be required to begin repaying on January 1, 2008, and which was secured by a first lien on all of Riptide's assets.  As a result of its July 13, 2007 securities issuances, Riptide incurred $1,280,000 in expenses that were not disclosed to Watson.

Third, the Riptide Defendants represented to Watson that Riptide would have or obtain the necessary funds to complete the merger and that he would be paid the cash portion of his consideration, $1,500,000, at the July 16, 2007 closing.  Yet Watson only received $800,000, with the remaining $700,000 purportedly to be paid at a second closing.  Additionally, Watson was induced to pay $125,000, on the understanding that it would be reimbursed at the second-closing.  The second closing never took place.

## IV.    The Employment Agreement

Watson entered into the Employment Agreement on July 15, 2007.  Pursuant to the agreement, Watson was to be employed by Bravera for three years, with the option to terminate

his employment at any time upon thirty days notice.  The Riptide Defendants agreed that Watson would be provided with all compensation he was owed under both the Merger Agreement and the Employment Agreement if his employment were terminated for any reason other than cause within his first three years working for Riptide.  Watson never received the compensation that he was owed when, pursuant to the Employment Agreement, he resigned on October 29, 2007.

## V.     The Software License

In addition to its acquisition of Bravera, Riptide also sought to license the exclusive rights to use, market, copy, sublicense, modify and further develop software developed and owned by Intellectus.  Pursuant to the Software License, executed on July 16, 2007, IP Holding of Nevada Corp. ("IP Holding"), a subsidiary of Riptide, would receive a license for the aforementioned rights, as well as the option to purchase Intellectus's remaining intellectual property rights in the future.  In return, IP Holding was to provide Intellectus with 450,000 warrants to purchase Riptide common stock and up to $3,675,000 in future payments.  Intellectus asserts that the Software Agreement expressly incorporated the Merger Agreement, and all of the alleged misrepresentations contained therein.  Watson and Intellectus performed their obligations under the Software Agreement, but IP Holding failed to do the same.

## VI.    The Settlement Agreement

Following Riptide's breaches of the various agreements, Watson and Intellectus sued Riptide, Bravera and IP Holding in the Supreme Court of the State of New York, while Riptide, Bravera and IP Holding sued Watson in this Court.  Relying upon representations made to them by the Riptide Defendants, Watson and Intellectus agreed to settle the aforementioned litigation and return Watson's Riptide common stock, in exchange for a payment to Watson of $450,000.  The Riptide Defendants allegedly knew, or should have known, that their representations

5

regarding Riptide's ability to pay Watson were false, and the settlement agreement was subsequently breached.

## DISCUSSION

When considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint" and construe the complaint in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007). The Court only "assess[es] the legally feasibility of the complaint;" it does not "assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003). To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

Complaints sounding in fraud must meet a heightened pleading standard, such that the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "In general, allegations of fraud based on information and belief do not satisfy the requirements of Rule 9(b)" unless they regard "matters particularly within the knowledge of the opposing party," for which the allegations may be made on information and belief but "must be accompanied by a statement of the facts on which the belief is founded." Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 116 (S.D.N.Y. 2002), aff'd, 352 F.3d 41 (2d Cir. 2003).

I.      **Watson's Negligent Misrepresentation Claims Against Connelly and Vitetta**[2]

To state a claim for negligent misrepresentation, a plaintiff must allege that "(1) the defendant had a duty as a result of a special relationship to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Nauwright v. Weiss, 826 F. Supp. 2d 676, 688 (S.D.N.Y. 2011) (citing Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). Negligent misrepresentation "'is a type of fraud and, as such, is subject to Rule 9(b)'s heightened pleading standard." Id. (quoting Maalouf v. Salomon Smith Barney, Inc., No. 02 Civ. 4770, 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003)).

A.      Special Relationship

"Liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmel v. Schaefer, 89 N.Y.2d 257, 263 (1996). In commercial cases, where, as here, there is "an absence of obligations arising from the speaker's professional status[,] . . . there must be some identifiable source of a special duty of care." Id. at 264. In this context, there must be "something beyond an ordinary arm's length transaction." Dandong v. Pinnacle Performance Ltd., No. 10 Civ. 8086, 2011 WL 5170293, at *15 (S.D.N.Y. Oct. 31, 2011) (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 188 (2d Cir. 2004)); see also Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 779-80 (S.D.N.Y. 2011) (collecting

---

[2] Because all of Connelly's defenses apply with equal force to Vitetta, who is appearing *pro se*, this section will refer to both of them, despite Vitetta's failure to raise these arguments himself.

cases).  "[D]etermining whether a special relationship exists ordinarily requires a fact-intensive, case-by-case inquiry."  In re Vivendi Universal, S.A., No. 02 Civ. 5571, 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004).  Courts "should be reluctant to dismiss a negligent representation claim" so long as the plaintiff has pled "'basic facts suggesting that a special relationship may exist.'"  Id.  (quoting Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commc'ns, Inc., No. 92 Civ. 7862, 1996 WL 312535, at *9 (S.D.N.Y. June 10, 1996)).

This Court previously dismissed Plaintiffs' negligent misrepresentation claims, with leave to replead, finding that Plaintiffs failed to plead them with sufficient particularity under Rule 9(b).  Specifically, the Court stated:

> Even if the nearly three-month-long merger negotiations between Plaintiffs and Riptide were sufficient to trigger a special relationship, the [unamended] Complaint d[id] not state what role, if any, Connelly [or Vitetta] had in negotiating the Merger Agreement and Software License; the specific representations [they] made to Plaintiffs; or whether [they] held [themselves] out as having expertise in order to induce Plaintiffs' trust.

Watson, 2012 WL 383946 at *4.  The Amended Complaint lays out in greater detail the roles played by all of the Defendants employed by Riptide, including both Connelly and Vitetta.

Nevertheless, Watson has failed to demonstrate that he had a "special relationship" with Connelly and Vitetta at the time they entered into the Merger Agreement.  The first specific discussion of Riptide's interest in Bravera appears to have been in a meeting on March 27, 2007.  Compl. ¶ 21.  On April 12, 2007, Connelly sent Watson an initial draft of the Merger Agreement, copying Vitetta.  Id. ¶ 27.  Notably, Plaintiffs do not allege that they had a preexisting relationship or any prior communications with either Connelly or Vitetta.  See M&T Bank Corp. v. LaSalle Bank Nat. Ass'n, 852 F. Supp. 2d 324, 337 (W.D.N.Y. 2012); M&T Bank Corp. v. Gemstone CDO VII, Ltd., 891 N.Y.S.2d 578, 581 (App. Div. 2009).  Two weeks later, on April 26, 2007, the Merger Agreement was executed.  Compl. ¶ 32.  Given the speed with which the

parties entered into the Merger Agreement after first meeting one another, "[t]he complaint reflects that the parties on both sides were operating independently, with no prior existing relationship and with no reason to repose trust in the other." Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011).  The merger itself was therefore "nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient to create a 'special relationship.'" Id.  Accordingly, Watson's negligent misrepresentation claims based on the Merger Agreement are dismissed.

In contrast, courts in this district have "refused to dismiss negligent misrepresentation claims where a plaintiff has alleged the existence of a special relationship . . . in the context of a corporate acquisition involving lengthy negotiations." Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 481 (S.D.N.Y. 2001).  Of particular note, a motion to dismiss was denied in litigation arising out of a corporate acquisition because a "special relationship" might have existed where "the parties engaged in lengthy negotiations," there was "at least the possibility of a long-term involvement between the shareholders" of the acquired corporation and the acquiring corporation, and the shareholders of the acquired corporation "received positions of trust within [the acquiring corporation], thus establishing a continued relationship." DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 373-74 (S.D.N.Y. 1999).  This is an apt description of the relationship between Watson and Riptide following the execution of the Merger Agreement but prior to the actual merger, as well as the execution of the Employment Agreement and Software License in mid-July, 2007.  During this period, Watson was involved in discussions regarding the strategy and management of Riptide, which he expected to employ him upon completion of the merger, and which subsequently did so.  Plaintiffs' negligent misrepresentation claims arising after the execution of the Merger Agreement are not dismissed for failure to plead a special relationship,

as they require adjudication pursuant to a "fact-intensive, case-by-case inquiry." In re Vivendi Universal, 2004 WL 876050, at *13.

      B.     Defendant's Representations

"Group pleading allows plaintiffs to 'rely on a presumption that statements in . . . group-published information are the collective work of those individuals with direct involvement in the everyday business of the company.'" Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) (quoting In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999)). As an exception to the normal pleading standards, the group pleading doctrine "is extremely limited in scope" and "does not apply to oral statements." Camofi Master LDC v. Riptide Worldwide, Inc., No. 10 Civ. 4020, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011).

Published statements by Riptide may be attributed to both Vitetta and Connelly, both of whom served as high-ranking officers at Riptide. Specifically, Vitetta served as Corporate Secretary, Senior Vice President, and Executive Vice President, Compl. ¶ 6, while Connelly served as the Chief Financial Officer. Id. ¶ 7. They are subject to the group pleading doctrine due to their role as "senior officers," which "qualif[ies] them as 'corporate insiders with active daily roles'" In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 398 F. Supp. 2d 244, 247, 250 (S.D.N.Y. 2005) (quoting Polar Int'l, 108 F. Supp. 2d at 237); see also In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 191-92 (S.D.N.Y. 2003).

Nevertheless, the group pleading doctrine does not apply to all of the misrepresentations made after the execution of the April 27, 2007 Merger Agreement because it "does not apply to oral statements." Camofi Master, 2011 WL 1197659, at *6. Specifically, the doctrine applies to "representations made in Riptide's SEC filings regarding a second closing at which Watson would be paid $700,000," Compl. ¶ 173(k), and those made in the Employment Agreement

10

regarding Watson's annual compensation and severance package, Compl. Ex. 2 §§ 4(a), 6(b), but not to "representations and promises of payment made . . . to induce Watson into entering the [Settlement] Agreement," which are not alleged to have been made in writing.  Compl. ¶ 173(l). The claims arising out of these latter representations are therefore dismissed, as is Intellectus's negligent misrepresentation claim set out in paragraph 216(g) of the Complaint, for the same reason.

## II.     Intellectus's Negligent Misrepresentation Claims Against Connelly and Vitetta

Intellectus brings negligent misrepresentation claims against Connelly and Vitetta that primarily arise out of the Merger Agreement, as incorporated into the Software Agreement between Intellectus and IP Holding.  Intellectus argues that the Software Agreement incorporates the Merger Agreement's "representations regarding capitalization and debt," or, alternatively, that the contract is ambiguous as to what aspects of the Merger Agreement it incorporates, presenting a question of fact that cannot be decided on a motion to dismiss.  Pl.'s Opp'n at 24. Both of these arguments are incorrect.

"Whether a contract is ambiguous is a question of law," as is the proper "interpretation of an unambiguous contract."  Midwest Fin. Acceptance Corp. v. F.D.I.C., 93 F. Supp. 2d 327, 330 (W.D.N.Y. 2000).  "A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law.  . . . An ambiguity does not arise . . . simply because the parties advance conflicting interpretations of the contract.  For an ambiguity to exist, both interpretations must be reasonable."  Id. at 330-31.  The Software Agreement is not ambiguous as to what aspects of the Merger Agreement it incorporates; it has only one reasonable interpretation.

Intellectus points to two provisions of the Software Agreement as relevant.  First, the agreement states that "[n]either party has made any representation, warranty, or covenant to the

other, express or implied, written or oral, except as set forth herein or as set forth in the relevant sections of the Merger Agreement as those relevant sections specifically relate to Intellectual Property Assets, or as set forth in a written certificate, instrument, or other document delivered pursuant to this Agreement."  Compl. Ex. 2 at Art. IV ¶ 3(a).  Second, it states that, "inclusive of the references to other agreements incorporated herein by reference[, the Software Agreement] constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties and is intended as a final expression of their Agreement."  Id. at Art. IV ¶ 16.

The latter provision is not ambiguous; it merely asserts that the contract incorporates portions of any other agreement that are explicitly incorporated elsewhere in the Software Agreement.  Contrary to Intellectus's interpretation, "inclusive of the references to other agreements incorporated herein by reference" does not mean that whatever other agreements are referred to are incorporated in their entirety, but rather that the Software Agreement incorporates only those aspects of the agreements that are referred to.  The former provision is therefore key to interpreting the Software Agreement.

Intellectus argues that the "relevant terms of the Merger Agreement" include its descriptions of Riptide's finances and capital structure because they affect the value of a warrant for the purchase of 450,000 shares of Riptide stock that Intellectus was to receive and are therefore "relevant" to the instant agreement.  This ignores the Software Agreement's specification that it only incorporates "relevant sections of the Merger Agreement *as those relevant sections specifically relate to the Intellectual Property Assets*."  Id. at Art. IV ¶ 3(a) (emphasis added).  All sections of the Merger Agreement referred to in paragraph 216 (a)-(f) of the Complaint are excluded, as they bear no relation to Intellectus's intellectual property.  Since

the alleged misrepresentation contained in paragraph 216(g) was dismissed <u>supra</u> on other grounds, Intellectus's negligent misrepresentation claim is dismissed in its entirety.

## III.   Intentional Fraudulent Conveyance Claim against Loeffel

### A.   <u>Legal Standard</u>

DCL § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."   "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor."  <u>In re Sharp Int'l Corp.</u>, 403 F.3d 43, 56 (2d Cir. 2005) (quoting <u>HBE Leasing Corp. v. Frank</u>, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995)).   A plaintiff must also plead allegations of intent to defraud with particularity, as required by Rule 9(b).  <u>Id.</u>  Given the difficulty of proving actual intent, a plaintiff may allege actual intent through circumstantial evidence, or "badges of fraud."  <u>Camofi Master</u>, 2011 WL 1197659, at *6.  These "badges of fraud" include:

> (1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance.

<u>Id.</u> (citing <u>Wall St. Assocs. v. Brodsky</u>, 684 N.Y.S.2d 244, 247-48 (App. Div. 1999)).

In addition to alleging facts that give rise to a "strong inference of fraudulent intent," to satisfy Rule 9(b), a complaint "must specify the 'particulars' of the alleged fraud – including, for example, the time, place, particular individuals involved, and specific conduct at issue."  <u>United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.</u>, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002) (citing <u>Luce v. Edelstein</u>, 802 F.2d 49, 54 n.1 (2d Cir. 1986)).  However, "allegations may be based on information and belief when facts are peculiarly within the opposing party's

knowledge." <u>Sullivan v. Kodsi</u>, 373 F. Supp. 2d 302, 306 (S.D.N.Y. 2005) (quoting <u>Wexner v. First Manhattan Co.</u>, 902 F.2d 169, 172 (2d Cir. 1990)).

B. <u>Analysis</u>

Plaintiffs allege that after the execution of the Merger Agreement and Software License, Riptide fraudulently transferred funds to Loeffel "under the guise of bonuses and increased salaries," Compl. ¶ 269, which left Riptide with insufficient capital.  Concurrently, Riptide was losing "tens of millions of dollars" while already indebted to Watson and Intellectus.  <u>Id.</u> ¶ 283. This was allegedly done with the intent to prevent Riptide from paying its debt to them.  The Court previously dismissed Plaintiffs' intentional fraudulent conveyance claim against Loeffel, with leave to replead, because Plaintiffs failed to provide sufficient details to satisfy Rule 9(b). <u>Watson</u>, 2012 WL 383946, at *9.  In particular, they did not "specify when the defendants executed the Transfers, the amounts of the Transfers, by what mechanism the funds were transferred, or the source of the funds."  <u>Id.</u>  Despite amending their complaint, Plaintiffs have failed to correct these deficiencies.

Plaintiffs now argue that Rule 9(b) is inapplicable because the particulars "are peculiarly within the opposing party's knowledge."  <u>Sullivan</u>, 373 F. Supp. 2d at 306.  While Plaintiffs allege that Loeffel was a corporate insider of Riptide, a badge of fraud giving rise to an inference of fraudulent intent, <u>Watson</u>, 2012 WL 383946 at *9, it is unclear when he achieved that status. The Complaint simply alleges that Riptide acquired Loeffel's previous company, Riptide Software, without specifying when this occurred; that Loeffel served as a corporate officer at Riptide, without specifying when he took on this role; and that he had direct involvement in Riptide's management and day-to-day operations "following the merger."[3]  Compl. ¶ 8.  Watson

---

[3] It is unclear whether the "merger" refers to Riptide's acquisition of Riptide Software, Loeffel's previous company, or Bravera, Watson's previous company.

himself was also a corporate insider of Riptide, however, having served as its Chief Sales Officer and Chief Marketing Officer, pursuant to the Employment Agreement, and having been involved with efforts to raise funds and review possible corporate acquisitions for Riptide throughout the spring and summer of 2007.  None of the cases cited regarding this exception to Rule 9(b) involve similar situations, in which the plaintiffs themselves were corporate insiders at the company whose assets were fraudulently conveyed.  See, e.g., Federal Nat. Mrtg. Ass'n v. Olympia Mortg. Corp., No. 04 Civ. 4971, 2006 WL 2802092 at *1-2 (E.D.N.Y. Sept. 28, 2006); Sullivan, 373 F. Supp. 2d at 304; Balkmatic Transport Co., Inc. v. Pappas, No. 99 Civ. 12070, 2001 WL 882039, at *1-2 (S.D.N.Y. May 11, 2001); Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F. Supp. 765, 767-68 (E.D.N.Y. 1995).

Moreover, Watson's time as a corporate insider overlapped with that of Loeffel.  Riptide Software and Bravera were both "second stage targets" of Riptide, following Riptide's initial purchase of another company, Compl. ¶ 18, suggesting that Riptide may have acquired Riptide Software at approximately the same time as it was pursuing and/or completing its merger with Bravera.   Loeffel is further described as having been a member of Riptide's "management team" as early as June 14, 2007, approximately one month prior to the closing of Riptide's merger with Bravera, id. ¶ 69, and, alongside Watson, was involved in Riptide's efforts to raise capital as early as May 2007.  Id. ¶ 64.  Because the Complaint does not so much as allege that the fraudulent conveyances to Loeffel occurred after Watson left Riptide, no explanation is provided for the paucity of facts of which Plaintiffs are aware, or why such facts are "peculiarly within [Defendants'] knowledge."  Sullivan, 373 F. Supp. 2d at 306.  Count XVIII of the Complaint is therefore dismissed.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Loeffel's motion to dismiss Count XVIII and Connelly's motion to dismiss Count VIII in their entirety. Connelly's motion to dismiss Count III is PARTIALLY GRANTED and PARTIALLY DENIED. Specifically, the alleged misrepresentations contained in paragraphs 173(a)-(i) and 173(l) are dismissed, but those in paragraphs 173(j) and (k) remain. The Clerk of the Court is directed to terminate the motions at Docket Nos. 67, 70 and 71. The parties are ordered to submit a civil case management plan to the Court by February 22, 2013.

Dated: New York, New York

February 4, 2013

SO ORDERED

_Paul A. Crotty_

PAUL A. CROTTY
United States District Judge

16